# 24-213-cr (L)
# 24-263 (con)

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,
*Appellee,*

v.

STEVEN WHITTICK, AKA Sealed Defendant,
*Defendant,*

KENNETH WYNDER, JR., AKA Sealed Defendant,
ANDREW BROWN,
*Defendants - Appellants.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF FOR DEFENDANT-APPELLANT
KENNETH WYNDER, JR.**

**TIMOTHY P. MURPHY**
Federal Public Defender's Office
Western District of New York
300 Pearl Street, Suite 200
Buffalo, New York 14202
Telephone: (716) 551-3341
*Attorney for Defendant-Appellant*
*Kenneth Wynder, Jr.*

## Table of Contents

Table of Authorities..................................................................iv

Jurisdictional Statement.........................................................1

Issues ....................................................................................1

Procedural History and Background .......................................3

    A.   The charges.................................................................3

    B.   The trial and sentencing attorneys ............................5

    C.   The government's discovery violations .....................11

    D.   The government's proof at trial...............................11

        1. *LEEBA and New York City*............................11

        2. *Ascensus* ..........................................................13

        3. *Codefendant Brown and SPS* ...........................14

        4. *Union Members* ...............................................15

        5. *The collective bargaining agreement and Directive 12* ...............................................15

        6. *The independent auditor* ..................................19

        7. *The trip* ...........................................................20

        8. *Tax issues* ........................................................20

        9. *Summary witness* .............................................21

    E.   Sentencing ...............................................................22

        1. *The Guidelines*...............................................22

        2. *Section 3553(a) factors* ...................................23

        3. *Restitution* ......................................................25

        4. *Bail motions* ...................................................25

Summary of Argument............................................................27

i

Argument ........................................................................... 29

Point I ............................................................................... 29

The appellant was deprived of his constitutional right to the
effective assistance of counsel. ........................................... 29

    A. Standards of review and ineffective assistance of counsel...29

    B. Counsel at trial.............................................................. 32

       *1. Per se ineffective assistance of counsel* .......................... 32

    a. The degenerative brain disease: CJD ................................ 32

    b. This Court should consider the December 26, 2023 email
       in furtherance of fairness, justice and judicial efficiency..... 36

    c. Trial counsel's conduct and attendant circumstances
       corroborate the existence of this disease ........................... 41

    d. A remand for a hearing should be ordered regarding whether
       counsel suffered from CJD at the time of trial.................... 43

       *2. Ineffective assistance of counsel based on the totality of
         the circumstances at trial* ............................................. 46

    a. Inaction.......................................................................... 46

    b. Failure to cross-examine witnesses and failure to review
       evidence .......................................................................... 47

    c. Other conduct and the summation .................................. 51

    3. Post-trial ineffective assistance of counsel ........................ 55

Point II .............................................................................. 59

The District Court erroneously ordered restitution based on
withdrawn funds that were permissible expenses under the New
York City Comptroller's directive....................................... 59

    A. Standards of review and restitution in general .................. 59

    B. The restitution order was erroneous ................................ 62

       *1. Directive 12* ................................................................. 62

*2. Insurance, attorney, auditor and accounting expenses* ....64

*3. Ineffective assistance of counsel, clear error, plain error and an abuse of discretion* ......................................70

Conclusion ........................................................................................72

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements ........................................73

# TABLE OF AUTHORITIES

## Cases

*Alnutt v. United States*, 588 Fed. Appx., 45, 47, 2014 U.S. App. Lexis 23810, 2014 W.L. 7182147 (2d Cir. 2014) ...........................................38

*Davis v. Alaska*, 415 U.S. 308 (1974) .....................................................49

*Dunham v. Travis*, 313 F.3d 724 (2d Cir. 2002) ....................................35

*Glasser v. United States*, 315 U.S. 60 (1942) .........................................32

*In re MacMillan, Inc.*, 107 F.3d 3, 1997 U.S. App. Lexis 7050, 1997 U.S. App. Lexis 4971 (2d Cir., Feb. 20, 1997) ......................37, 38

*Pereira-Gomez*, 903 F.3d 151 (2d Cir. 2018) .........................................61

*Ross v. Kemp*, 785 F.2d 1467 (11th Cir. 1986) ........................................37

*Strickland v. Washington*, 466 U.S. 668 (1984)............................. passim

*Tippins v. Walker*, 77 F.3d 682 (2d Cir. 1996) ..................... 30, 34, 35, 36

*United States v. Adams*, 768 F.3d 219 (2d Cir. 2014).............................30

*United States v. Aulet*, 618 F.2d 182 (2d Cir. 1980) ..............................38

*United States v. Cadet*, 664 F.3d 27 (2d Cir. 2011) ...............................60

*United States v. Cain*,  671 F.3d 271 (2012) .........................................32

*United States v. Curcio*, 694 F.2d 14 (2d Cir. 1982) ........................31, 58

*United States v. Desnoyers*, 708 F.3d 378 (2d Cir. 2013).......................60

*United States v. Freeman*, 17 F.4th 255 (2d Cir. 2021) .....................30, 34

iv

*United States v. Gamez*, 577 F.3d 394 (2d Cir. 2009)..............................61

*United States v. Helmsley*, 941 F.2d 71 (2d Cir. 1991)..........................60

*United States v. Jaffe*, 417 F.3d 259 (2d Cir. 2005)................................60

*United States v. Kaid*, 502 F.3d 43 (2d Cir. 2007)..................................35

*United States v. Leone*, 215 F.3d 253 (2d Cir. 2000) ........................43, 45

*United States v. Montague*, 67 F.4th 520 (2d Cir. 2023) .........................61

*United States v. Morris*, 350 F.3d 32 (2d Cir. 2003)..............................30

*United States v. Murphy*, 942 F.3d 73 (2d Cir. 2019)............................61

*United States v. Olano*, 507 U.S. 725 (1993) .........................................61

*United States v. Parker*, 745 Fed. Appx. 431, 432, 2018 U.S.
    App. Lexis 35807, 2018 W.L. 6720028 (2d Cir. 2018) .........................38

*United States v. Perevoznikov*, 2024 U.S. App. Lexis 8060
    (2d Cir. 2024) .......................................................................................45

*United States v. Romero*, 2024 U.S. App. Lexis 4925,
    2024 W.L. 886197 (2d Cir. 2024).........................................................45

*United States v. Sommerville*, 2024 U.S. App. Lexis 7102,
    2024 W.L. 1266227 (2d Cir. 2024)........................................................45

*United States v. Tarbell*, 728 F.3d 122 (2d Cir. 2013) ............................30

*United States v. Turner*, 2023 U.S. App. Lexis 20674,
    2023 W.L. 5091187 (2d Cir. 2023)........................................................44

*United States v. Varrone*, 554 F.3d 327 (2d Cir. 2009)..........................60

*Wood v. Georgia*, 450 U.S. 261 (1981)...................................................32

## Statutes

18 U.S.C. § 2 ................................................................... 3

18 U.S.C. § 371 ................................................................ 3

18 U.S.C. § 1343 ........................................................... 3, 63

18 U.S.C. § 3143(b) ........................................................... 26

18 U.S.C. § 3231 ............................................................... 1

18 U.S.C. § 3553(a) ....................................................... 23, 56

18 U.S.C. 3663A(a)(2) ........................................................ 60

18 U.S.C. § 3663A(c)(2) ...................................................... 60

18 U.S.C. § 3664(e) .......................................................... 60

18 U.S.C. § 3742(a) ........................................................... 1

26 U.S.C. § 7201 .............................................................. 3

28 U.S.C. § 1291 .............................................................. 1

28 U.S.C. § 2244(b)(3) ....................................................... 45

28 U.S.C. § 2255 .......................................................... 30, 44

## Other Authorities

Bureau of Prisons, inmate regis. no. 88067-055, accessible at:
  https://www.bop.gov/mobile/find_inmate/
  byname.jsp#inmate_results ................................................ 27

vi

Centers for Disease Control and Prevention, "Creutzfeldt-Jakob
  Disease, Classic (CJD)," https://www.cdc.gov/
  prions/cjd/index.html ...................................................................... 33, 36

Creutzfeldt-Jakob Disease Foundation, Inc., accessible at:
  https://cjdfoundation.org/donate/ ......................................................... 37

National Library of Medicine, N. Chitravas, MD, R. Jung, MD, D.
  Kofskey, J. Blevins, P. Gambetti, MD, R. J. Leigh, MD, M. Cohen, MD,
  "Treatable Neurological Disorders Misdiagnosed as Creutzfeldt-Jakob
  Disease," accessible at:
  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3170496/ .................. 42

New York Times, George Goltzer obituary, accessible at:
  https://www.legacy.com/us/obituaries/nytimes/name/george-
  goltzer-obituary?id=53946106.............................................................. 38

NYS Department of Health, "Creutzfeldt-Jakob Disease," accessible at:
  https://www.health.ny.gov/diseases/communicable/creutzfeldt-
  jakob/fact_sheet.htm#:~:text=Approximately%20one%2Dhalf
  %20of%20the,to%2095%20percent%20have%20died..................... 33, 36

NYSACDL site, accessible at:
  https://nysacdl.org/members/group.aspx?id=214527 ........................... 26

*The Art of Cross-Examination*, Francis L. Wellman, Ch. 7 ("Silent
  Cross-Examination"), 1903, 1904, 1923 and 1936 by Macmillan
  Publishing Co.; 1962 by Collier Books (4th ed.). ................................... 47

*The City of New York Office of the Comptroller, Internal Control and
  Accountability Directives, Directive #12: Employee Benefit Funds*
  (hereafter "Directive 12"). This document was moved into evidence as
  defense exhibit A (A 1410-1431). It is also accessible online at: chrome-
  extension://efaidnbmnnnibpcajpcglclefindmkaj/https://comptroller.nyc.
  gov/wp-content/uploads/2014/12/Directive12-Non-
  MLC_UnionEmployeeBenefitFunds.pdf ............................... 7, 18, 62, 63

vii

WebMD, "What is Creutzfeldt-Jakob Disease" (medically reviewed by Christopher Melinosky, MD, on May 12, 2023), accessible at: https://www.webmd.com/brain/what-is-creutzfeldt-jakob-disease ...... 39

**Rules**

ABA Model Rule 1.1 ............................................................................ 31, 36

ABA Model Rule 1.16 (a) .......................................................................... 31

ABA Model Rule 1.16(a)(2) ....................................................................... 44

ABA Model Rule 1.7(a)(2) ......................................................................... 58

ABA Standards for Criminal Justice, 4-1.1(a) ....................................... 31

Fed. R. Crim. P., App. P. 10(e) ................................................................. 38

Fed. R. Crim. P. 52(b) ............................................................................... 60

**Jurisdictional Statement**

Appellant Kenneth Wynder, Jr., was charged in a criminal complaint on July 9, 2020 with a single count of wire fraud, which triggered the subject matter jurisdiction of the United States District Court for the Southern District of New York pursuant to 18 U.S.C. § 3231. A 6.[1]

Mr. Wynder was charged in a superseding indictment on July 22, 2021, with wire fraud, conspiracy and various tax evasion counts. A 41. He was convicted of all counts following a jury trial on May 30, 2023, and was sentenced on January 17, 2024. A 30, 36. Judgment was entered on January 19, 2024. A 36-37, 1954-1962. A notice of appeal was timely filed on January 23, 2024. A 37, 1963. This Court enjoys jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

**Issues**

1.    Whether Mr. Wynder was deprived of his Sixth Amendment right to the effective assistance of counsel, as trial counsel was

---

[1] Materials in the Joint Appendix will be cited as "A __ ."

suffering from an aggressive and degenerative brain disease, preventing Mr. Wynder from receiving a fair trial. Further, did counsel's deteriorating physical and mental condition *per se* deprive the appellant of the effective assistance of counsel? Alternatively, where counsel's performance was objectively deficient, was the appellant deprived of effective assistance of counsel in light of all of the circumstances? Finally, was Mr. Wynder deprived of his Fifth Amendment right to Due Process, as well as the effective assistance of counsel, by his sentencing attorney, who admitted having a conflict of interest, not seeking a hearing and making a record regarding the incapacity of trial counsel to provide effective assistance?

2.     Whether, in light of the New York City Comptroller's Directive 12, the District Court abused its discretion in ordering restitution of $529,000 to union members, where there was insufficient evidence of the impropriety of amounts withdrawn from the annuity fund. Further, did the District Court clearly err, as counsel sat idly by, in not considering bank records moved into evidence establishing thousands of dollars in permissible expenditures paid by the union for legal,

auditing and accounting services, in determining a proper restitution amount?

## Procedural History and Background

A. <u>The charges</u>

Mr. Wynder was charged in a seven-count superseding indictment with conspiracy to commit wire fraud, wire fraud, conspiracy to defraud the United States and four counts of tax evasion, all arising from conduct occurring between 2012 and 2020. *See*, 18 U.S.C. §§ 2, 371, 1343; 26 U.S.C. § 7201; A 41-45.

The Law Enforcement Employees Benevolent Association ("LEEBA"), a small union of about 800 members, was founded by Mr. Wynder in 2005 following litigation with New York City. Mr. Wynder wanted to expand LEEBA's membership. As the City was required to fund LEEBA's annuity fund, the more LEEBA grew, the more it cost the City.

The government's theory was that Mr. Wynder, as president of LEEBA, fraudulently caused the withdrawal of funds from the union's annuity fund (overseen by the company, Ascensus) under the pretext of

paying administrative expenses, which were broadly defined in the Comptroller's rules. These 17 transactions between 2012 and 2019 were facilitated by codefendant Brown, the union's benefits coordinator. Bad record keeping aside, there was no second set of books kept. No records were hidden, shredded or destroyed.

The government also alleged that Mr. Wynder caused withdrawals from the union's funds in a manner that evaded the Internal Revenue Service ("IRS"). Though he attempted to set up payment plans in the past, Mr. Wynder failed to file tax returns for 2015 through 2018.

Charged alongside Mr. Wynder in the first two counts was Andrew Brown, the benefits coordinator for LEEBA's annuity fund. The third count, a tax evasion-related conspiracy charge, referenced LEEBA's former treasurer, Steven Whittick. Both Brown and Whittick were ultimately convicted of various crimes.

Wynder and Brown both pleaded not guilty to all charges and were tried together.

B. The trial and sentencing attorneys

Mr. Wynder's primary trial attorney was suffering from a degenerative brain disease. The signs were present before, during and after trial. He was forced to withdraw as counsel because of his deteriorating physical and mental condition two months after the verdicts. He was dead four and a half months after withdrawing (just three weeks prior to sentencing).

At the beginning of the first attempt at jury selection, on March 6, 2023, Wynder's trial counsel, George Goltzer, collapsed in court, requiring significant medical treatment. A 2109, 2122*; see also* A 332-334, 336. The docket entry for that date reads in pertinent part:

> The trial scheduled for March 6, 2023 is
> VACATED. The health concern causing the trial
> to be vacated occurred early during voir dire.
> There will be a conference for setting a new trial
> date on March 16, 2023… My reasons for this
> [speedy trial] finding are that the grant of the
> continuance is needed due to health necessities
> of one of the lead defense counsel.

*United States v. Wynder*, SDNY No. 1:20-cr-00470 ("SDNY"), Dkt. 187.

During the March 16, 2023, proceedings, Mr. Goltzer explained he was scheduled to see a surgeon to evaluate his blood test and determine if surgery was imminent. A 331-332. Therein, the

5

government recognized counsel's "need to be further evaluated before being prepared to try the case…" A 334 Finally, the court observed the need for "an evaluation that is material to determining when the case can be tried and ensuring continuity of counsel if that is possible." A 334.

Mr. Goltzer told the court on April 18, 2023, that he "met with a new team of doctors on April the 12th, and they advised [him] that they found a way to avoid surgery and a longer recuperative period." A 336. A new trial date could be set. A 336. Regarding the trial delay, District Court found that "time was needed to ensure continuity of counsel in this case as a result of the aborted jury selection on the prior trial date in this case." A 339. Mr. Goltzer collapsing in court ultimately delayed the trial for approximately 11 weeks, with jury selection not resuming until May 22, 2023.

Part of the government's expected proof was that New York City placed money intended for LEEBA's annuity fund in escrow based on its purported belief that fraud was occurring. A 290. The defense theory, as of *three weeks* prior to the first trial date, was that the City actually wanted to ruin LEEBA as it had burdened the City with

6

litigation and owed-benefits. A 310-311. According to trial counsel (as late as February of 2023), Mr. Wynder had the right to withdraw the funds in question from Ascensus for administrative expenses, consistent with the NYC Comptroller's Directive 12 regulation.[2] A 310-311. This defense theory all but disappeared at trial.

At trial, Mr. Goltzer barely litigated any issues of substance. One contested juror challenge (for cause) was made jointly with codefendant's counsel. *See*, A 437-439. There was a grand total of two objections, both of them minor, lodged by Mr. Goltzer during the three days of testimony. *See*, A 707, 974. Moreover, he cross-examined just seven of the government's fifteen witnesses. *See*, A 630-635, 695-702, 708-709, 813, 817-838, 975-978, 1004-1008, 1017, 1034-1035, 1120-1124, 1195, 1210. This was followed by a quick defense summation,

---

[2] The document's full title is *The City of New York Office of the Comptroller, Internal Control and Accountability Directives, Directive #12: Employee Benefit Funds* (hereafter "Directive 12"). This document was moved into evidence as defense exhibit A (A 1410-1431). It is also accessible online at: chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://comptroller.nyc.gov/wp-content/uploads/2014/12/Directive12-Non-MLC_UnionEmployeeBenefitFunds.pdf (last accessed, June 21, 2024).

which was followed by quick guilty verdicts. A 1282-1293, 1400-1405, 2192-2194.

Just over two months later, Mr. Goltzer filed with the District Court a letter, dated August 3, 2023, indicating:

> Please accept this letter as an application to relieve my firm of further representation of Kenneth Wyndor. *(sic)* This letter is written because of <u>a rapid deterioration of my health which renders it impossible to represent him adequately</u>… My primary physician introduced me to a neurologist at Mount Sinai Hospital in New York. The neurologist conducted a series of tests including a brain scan. <u>The brain scan identified changes to my brain which were to the neurologist suggestive of a brain tumor</u>. Fortunately, that has been ruled out. However, <u>the rapid deterioration of my health renders it impossible to competently represent Mr. Wyndor *(sic)*, at sentencing and presumably on appeal. My speech is slurred so I cannot properly argue cases in court and my ability to concentrate and write has been diminished. I simply cannot focus, research and write or do the things that would enable me to properly represent Mr. Wyndor *(sic)* at this time. At present, I am under the care of the Mount Sinai neurology team. The neurology team hospitalized me for a week and is continuing to evaluate the cause of the neurological issues that may be present and need to be further evaluated and treated</u>. I regret any inconvenience caused to the Court and I would respectfully urge Your Honor to relieve my firm from the representation of Mr. Wyndor *(sic)* and appoint other CJA counsel…

SD 1-2 (underlined emphasis added). [3]

Mr. Goltzer's motion to be relieved was of course granted by the District Court on August 3, 2023. A 1785. He died on December 26, 2023,[4] a few weeks prior to sentencing.

New counsel was assigned on August 3, 2023. A 1785, 1882. Although counsel recognized at appellant's January 17, 2024 sentencing that Mr. Goltzer had died of a condition connected to his withdrawing from the case – *and* learned from observers of the trial that appellant did not receive adequate representation – no further relief (besides a bail motion) was sought. No hearing was requested. In support of his motion for bail pending appeal, counsel observed:

> I do know in this particular matter there are
> serious questions that *[sic]* are going to raise
> about trial counsel's effectiveness and conduct.
> As you know, I was not trial counsel. At the time,
> the prior counsel who, unfortunately, has passed

---

[3] This letter was filed under seal with the District Court and has been confidentially submitted to this Court as part of this appeal. *See*, Sealed Documents disc ("SD").

[4] As addressed below, Mr. Golzer's family sent out an email to friends, family and courts, announcing his sad passing on December 26th. A link for the CJD Foundation website was included in the email. A 1786. This document was made part of an exhibit to appellant's bail motion. A 1787-1790.

> away about a month ago…. In December trial counsel passed, your Honor. <u>He was ill during trial</u> and, in fact, I believe <u>he fainted during the trial during jury selection</u>. <u>I've spoken to a number of different people who indicated that they have questions about his ability at the time to present an effective defense on Mr. Wynder's behalf</u>…in the preliminary review of the record and in speaking to a couple of different people, it is my belief that it would not be a frivolous motion based on the ineffectiveness -- and not because trial counsel was not a good lawyer, but <u>because of his condition at the time, his illness at the time effected his ability to do the right thing on Mr. Wynder's behalf</u>.

A 1942-1943 (underlined emphasis added).

However, because the sentencing attorney was a longtime friend of the late Mr. Goltzer, he declined to substantively litigate issues involving ineffective assistance of counsel:

> [I] intend to file a notice of appeal on behalf of Mr. Wynder, but I also intend to ask the Second Circuit to be relieved because <u>I knew trial counsel for well over 40 years, both personally and professionally, and I don't want to be in a position to have to make certain allegations</u>.

A 1942 (underlined emphasis added).

Following the government's objection to bail, the District Court opined Mr. Goltzer was a vigorous and effective advocate who

performed at a high level during the trial. A 1944-1947. The specious bail motion was denied accordingly. A 1946-1947.

C. The government's discovery violations

On June 30, 2022, the District Court condemned the government's extensive discovery violations, A 231-235, in erroneously claiming to have turned over about a half million pages to the defense, much of which the court concluded was critical. A 232-234, 251-258, 264-265. While not finding bad faith, A 257-258, 268-269, District Court reacted angrily, opining that had the government attorneys committed such misconduct as members of a private firm, they would have been fired. A 234-250; *see also*, A 256. The court ultimately issued a written opinion on August 19, 2022, ordering Jencks Act materials be provided by a date certain. A 283; *see also*, A 240-241, 246-247, 250-251, 254-255.

D. The government's proof at trial

### *1. LEEBA and New York City*

With 8 employees and 85 bargaining units, LEEBA represents 800 NYC workers in collective bargaining. A 609, 612, 621, 963-964.

11

The union started in 2005, when Local 300 was decertified. A 610, 620, 633. LEEBA took over Local 300's annuity fund. A 967. LEEBA's board of directors selected Mr. Wynder as president. A 609-611, 749-750, 1153. He wanted to grow LEEBA. A 612-613, 799, 874-875. Its benefits include health insurance and an annuity (retirement) fund, the latter of which was funded directly by New York City pursuant to a collective bargaining agreement. A 613-614, 695, 739, 752-753, 758-761, 764, 767-770, 773, 965, 995.

As per LEEBA's agreement with the City, the Comptroller's Directive 12 required that reports be filed. An independent audit was also required. A 758-759, 764-765. There were three LEEBA funds governed by its agreement with NYC: welfare and annuity funds for active members and a retiree fund. A 759-760, 773, 791, 910-912, 928-929. LEEBA represented employees from the Departments of Environmental Protection, Sanitation and Transportation. A 761-762, 881, 984-985. Two of these departments had annuity funds. A 759-760, 772-773, 854.

### 2. *Ascensus*

Ascensus was the custodian of the 800 annuity fund accounts. A 614, 636, 667, 698-699, 715, 919, 965. Ascensus provided LEEBA members a quarterly statement, A 615, 636-637, which is more than Local 300 provided. T 636. Members could also check their plans online. A 642, 644. Ascensus received fees for performing record-keeping services for the fund. A 658, 671-672, 681, 702.

Wynder and Brown were the plan administrators. A 646-647, 661. Ascensus relied on their representations. A 684, 686-687, 706-707. Invoices and withdrawal authorization forms were required for each transaction. A 681, 686, 716-718. The authorization form was typically completed by the appellant. A 681. Though Ascensus supposedly did not know if LEEBA's withdrawals were related to the administration of the plan, A 687-688, emails from March 2012 indicate Ascensus signed off on LEEBA's procedures only after consulting with in-house counsel. *See*, A 1585-1586 (gov. exhib. 334). Ascensus informed at least one LEEBA member that Mr. Wynder could withdraw administrative costs from the annuity fund. A 635**.**

13

### 3. Codefendant Brown and SPS

Wynder and Brown were good friends. A 712, 736. Brown's financial services firm, Strategic Plan Services ("SPS"), performed administrative work for the annuity fund. A 655-656, 713-714, 728, 735, 870. Brown was the LEEBA benefits coordinator or administrator, A 620, 781-782, 795-796, 902, and broker for LEEBA's three funds. A 866-867, 870-872, 895. As a broker, Brown received commissions when LEEBA insurance premiums were paid. A 704-705, 715, 862-864, 871-872, 894-895.

Tracey Guy worked for Brown at SPS, A 711-712, 729-731, filling out and faxing forms to Ascensus. A 730. Brown would inscribe the reason for the withdrawal on the authorization form, such as "administrative fee," and appellant would sign it. A 719, 895. No withdrawal forms were concealed by SPS. A 730-731. Jacqueline Perez also worked for SPS, helping to administer the withdrawal paperwork with Ascensus. A 735, 742-745. Brown would note the reason on the invoice, which was typically administrative, management costs and fees. A 723-728, 744-745.

14

### 4. *Union Members*

Three LEEBA members testified to noticing withdrawals made from their annuity accounts. A 616-618, 621, 627-629, 632-633, 963-964, 970-972, 1184-1189. One member spoke with Brown, who said the amount was reduced because of a loan, further blaming Mr. Wynder for the issue. A 1190-1195. Another member called the appellant, who said one of the fees related to an audit. A 622-623. Appellant told another member one of the withdrawals was a legal fee that would be returned. A 973-975. Two of the three members testified to their balances increasing since their funds began. A 627-628, 634-635, 977.

### 5. *The collective bargaining agreement and Directive 12*

Maryanne Mullany worked for the NYC Comptroller's Office. A 756-757. The agreement with the City and the annuity plan, in addition to Directive 12, placed limits on LEEBA. A 770-771, 852-854. No income may be withdrawn from the plan for purposes other than to benefit its participants. A 854. According to Mullany, Directive 12 does not permit withdrawals from the annuity fund to pay expenses for a different fund. A 854. The exception was for reasonable expenses for

day-to-day operations. A 770. As discussed below, Mullany's testimony was contradicted by Directive 12 itself, which broadly permits expenses for a number of administrative-related reasons. A 1410-1431.

The appellant purportedly refused to provide access for the two attempted audits of LEEBA in 2017. A 773-774, 778, 844. The first year appellant made a Directive 12 filing was for 2014 (filed in 2017). A 778, 783, 847. Because the submitted financial statements indicated the funds were not separated, the proposed audit expanded. A 785-786, 829-830. Mullany indicated there needed to be an allocation and methodology regarding expenses. A 798. The City initiated their audit in April 2017, and the parties met in May and August. A 780-784, 817, 828, 848. In July, LEEBA filed restated financial statements for 2014, with some changes made. A 786-787, 826, 828, 848-850. Prior to 2016, the three funds were not properly segregated, but rather were operated as one organization. A 790-791. A letter was issued describing material weaknesses in LEEBA's accounting. A 792-793. LEEBA restructured as per the Directive and began separating expenses with sharing arrangements. A 791-792.

LEEBA was said to have not complied with the Comptroller's requirements following the August 2017 meeting. A 800. Mullany sent appellant correspondence after he purportedly shut down the audit. A 800-801. On October 17, 2017, Mr. Wynder emailed Mullany indicating the Comptroller's Office must answer correspondence from appellant's attorney before any audit continued. Mullany claimed to have not received the letter. A 801-802. Mullany emailed appellant on October 24, 2017, reminding him of his obligation to comply. Legal action was threatened. A 802-803, 811.

In August of 2018, the City informed LEEBA the agreement was materially breached by their not filing Directive 12 reports. A 804-806, 844-845, 1126. The City had now placed owed money for the annuity fund in escrow. A 806-807, 845-846, 852. Correspondence from the City on September 25, 2018, confirmed this. A 807, 810-811, 1131. An administrative subpoena was issued in October 2018. A 803-804, 809. Mr. Wynder indicated the subpoena was already complied with and that the City had illegally stopped paying into the annuity fund. A 809-810. No further audit occurred. A 811, 822-823, 846.

17

Some records were sent by LEEBA to the audit team. A 820, 824.
And Mullany acknowledged there was no indication of LEEBA debt
owed from one account to another, except for $31,000 owed from the
annuity fund (corrected in restated financial statements for 2014 and
2015). A 827-828. LEEBA effectively stated it had made a mistake, but
made efforts to comply in its supplemental financial statement. A 828,
830.

Mullany further acknowledged § 2.4 of Directive 12 addresses
administrative" and "benefit" expenses, including rent, insurance and
miscellaneous fees. A 833-834. Section 3.4 of the Directive addresses
reasonable administrative expenses which indirectly benefit fund
members. These must not be excessive or unreasonable. A 835.
Mullany acknowledged Appendix A to Directive 12, which listed
appropriate categories for expenses, A 836-838, 855-856, including
accounting fees, legal fees, insurance, employee fringe benefits, travel
allowance and salaries. A 1427-1428. Section 3.8 of the Directive
indicates that if benefit funds share expenses, it must be done
equitably. A 855.

18

### 6. The independent auditor

Russell Furey was a senior auditor at Koenig,[5] which provided auditing services for LEEBA's annuity fund. A 897-900, 918. Corrections were recommended, including having a formal expense sharing agreement for the three funds. A 901, 910, 912-913. While the LEEBA board could be reimbursed for necessary and reasonable expenses in furtherance of their duties, A 904-906, shared expenses should be segregated. A 910-911, 913-914. Incomplete information and delays kept the full audit from being completed. A 916. A financial restatement was issued, reclassifying two transactions (totaling $31,000) from the annuity to the welfare fund. A 924, 931, 933-934. In 2016, however, LEEBA began to restructure and segregate funds under Directive 12. A 932-933, 938, 942. Correspondence was sent to LEEBA indicating there were internal control deficiencies. A 929, 937, 939; *see also*, A 778-779, 793, 843-844.

---

[5] The Koenig firm eventually merged with a firm named Prager Metis. A 897.

### 7. *The trip*

The appellant and other LEEBA board members attended a trip to Texas in September 2018 to strategize on union issues. A 987-988, 1008, 1010. Expenses were paid by LEEBA. A 987. While football games were attended, A 988, there was no evidence of any game tickets being paid for by the union. LEEBA allowed a $1,000 per diem in addition to paying for the hotel and airfare. A 988. Hotel bills from the trip totaled more than $2,700. A 1126-1128.

### 8. *Tax issues*

ADP provided employer tax and payroll services, A 1040-1042, 1044-1045, 1052, 1057-1058, 1066-1067, including facilitating tax withholding requirements for LEEBA. A 1042-1043, 1045, 1047-1049, 1060, 1064, 1073-1074. This included preparing its W-2 forms. A 1049-1050. If employee payments were not included on the form, the IRS was not informed. A 1065, 1074, 1112-1113. Steven Whittick, the LEEBA treasurer, A 1043-1044, asked ADP if LEEBA could be tax exempt. A 1070-1071. There were payments to the appellant outside of the payroll. A 936. The appellant's reported salaries were: $101,500 for 2016, $114,800 for 2017 and $40,000 for 2018. No tax returns were

filed from 2015 through 2018. A 1054, 1060-1063, 1065, 1081-1082.

There was no W-2 form for the appellant in 2019. A 1065-1066. In

October of 2014, the appellant bought a used 2011 Lexus for over

$77,000, A 1086-1089, paid for by LEEBA. A 1088-1092, 1100.

### 9. Summary witness

Katrina Laperuta was an FBI special agent; she presented

summaries and charts, effectively providing a summation under oath.

A 1020-1026. Transactions and communications between 2016 and

2018 involving SPS, Ascensus and LEEBA regarding amounts of

$25,000, $50,000 and $60,000, were displayed for the jury. A 1027-

1031, 1126.

Appellant communicated via texts and emails with Mr. Brown

and Mr. Whittick regarding the transfer of money between LEEBA

accounts. Likewise, SPS, LEEBA and Ascensus communicated

regarding the transfer of money. A 1131-1132, 1134-1143, 1146-1149.

An example was an October 23, 2018 text between SPS and Ascensus,

seeking a withdrawal of $60,000 for administrative and management

costs. A 1131-1132. On November 2, 2018, Ascensus transferred the

money to LEEBA. A 1133-1134. Amounts in 2018 and 2019 included

21

transactions of $16,000, $15,000, $30,000 and $25,000. A 1134-1140. The basis for transferring money was often for administrative and management costs. A 1139-1140. The reasons noted on the invoices also included audit and legal fees. A 1156. The total amount of annuity fund withdrawals was $529,000. A 1157.

The jury convicted Wynder and Brown as charged. A 1402-1403.

E. <u>Sentencing</u>

As noted, appellant had a newly assigned attorney for his January 17, 2024, sentencing.

### 1. *The Guidelines*

There were no objections to the District Court's Guidelines calculation of 70 to 87 months. A 1896; PSR ¶ 123.[6] With no prior convictions (or arrests), PSR ¶¶ 75-80; A 1803, Mr. Wynder was in Criminal History Category I. Appellant's offense level of 27 was the result of enhancements for pecuniary loss, abusing his position of trust, his leadership role and the number of victims. A 1896, 1902, 1904,

---

[6] The August 21, 2013 report, filed contemporaneously herein under seal, is cited herein as "PSR __."

22

1932; PSR ¶¶ 64-74, 123. He received 40 months in prison. A 1936. Brown was sentenced during the same proceedings. His Guidelines range was 37 to 46 months; he received 18 months in prison. A 1895-1896, 1935.

### 2. Section 3553(a) factors

Mr. Wynder is now sixty-one years old, a native of Astoria, Queens. Though born into poverty, he was never pulled into the drug or gang culture that so many are. PSR p. 3, ¶¶ 82, 84; A 307-308, 1803, 1904, 1908-1909, 1932-1933. He has no history of drug or alcohol abuse. *Id*.; PSR ¶ 101. Mr. Wynder began working at age fourteen and was raised by a single mother. He has two grown daughters. PSR ¶¶ 82, 84, 87, 116; A 1792-1795, 1797-1801, 1803.

Mr. Wynder suffered a stroke after the trial and has had blood clots and spinal stenosis. A 1799-1801, 1904, 1908-1909, 1932; PSR ¶¶ 94-95. He is the sole caretaker for his wife of more than twenty years, Jacqueline, who is terminally ill. She has been diagnosed with leukemia, which continues to worsen. PSR ¶ 86; A 307-308, 1794-1795, 1797-1798, 1904, 1908-1909, 1932-1933.

Mr. Wynder has a college degree, worked for the NYS Police for approximately thirteen years and eventually taught at the NYS Police Academy in Albany. In 2005, despite having little administrative experience, he founded LEEBA, becoming its first president. PSR ¶¶ 103-104, 109-110; A 1793-1794. Though he grew up without a male role model, appellant became one himself. A 1902-1903, 1930-1931. His life's focus is being a husband, father, caregiver and sibling. A 1903, 1933. Mr. Wynder left school early to care for his younger sister, later returning to, and finishing, college. A 1903. As a police officer, he became a union leader. His goal in starting a union was to protect law enforcement personnel. A 1903-1904.

Mr. Wynder was released at the outset of this prosecution in 2020. PSR, p. 2. He never violated a term of his release. PSR ¶¶ 8, 89. On several occasions, the Probation Office, the U.S. Attorney's Office and the District Court even trusted him enough to permit his travel out of state during the pendency of these proceedings. *See,* SDNY Dkts. 89, 92, 96, 99, 110, 163, 167, 169, 173 and 189.

### 3. Restitution

Restitution was ordered in the amount of $838,683, with $309,683 going to the IRS and $529,000 directed for union members. A 1929, 1931, 1936, 1950-1951, 1960. $116,003 of the IRS amount was joint and severable with Mr. Whittick. The entire amount owed to the union was joint and severable with codefendant Brown. A 1937-1938; PSR ¶ 136.

### 4. Bail motions

Towards the close of sentencing, appellant's newly assigned counsel requested, over the government's objection, that Mr. Wynder be granted bail pending appeal. A 1941-1947. As noted, counsel suggested that Mr. Wynder received ineffective assistance of counsel based on Mr. Goltzer's inadequate performance caused by the illness that ultimately took his life the month before. *Id*. The motion was denied. Mr. Wynder was ordered to surrender by May 7, 2024. A 1948.

A more comprehensive bail motion was filed in this Court by appellate counsel on April 17, 2024. In support were declarations by the appellant and his investigator, wherein, among other things, it was

alleged that despite Mr. Goltzer being a well-regarded[7] and aggressive criminal practitioner, he was unfocused and tired during trial, a different lawyer than before; his not cross-examining more was not like him. A 1996-1997. His summation was estimated to have been just 11 or 12 minutes long. A 1992-1193, 1997. It was further alleged that counsel's capacity to function as a competent attorney was noticeably diminished during the proceedings, with Goltzer shaking and mumbling during trial, as well as failing to call important witnesses. *See*, A 1990-1992, 1997. Moreover, it was alleged that counsel became homebound in June 2023 and was transferred to hospice that September. A 1993.

In sum, appellant argued the presence of counsel's terminal and degenerative brain disorder while trying appellant's case satisfied 18 U.S.C. § 3143(b), compelling Mr. Wynder's release to care for his gravely ill wife pending this appeal. A 1965-1988. Following oral argument, the motion was denied. A 2143.

---

[7] Mr. Goltzer was once President of the New York State Association of Criminal Defense Lawyers. *See*, NYSACDL site, accessible at: https://nysacdl.org/members/group.aspx?id=214527 (site visited, April 13, 2024).

*****

Though the District Court at sentencing recommended that appellant be assigned to serve his sentence at the federal camp at Allenwood *(near his home in Pennsylvania)*, A 1948, because of the then-60-year-old appellant's medical issues, he was instead assigned to the Federal Medical Center in Fort Worth, Texas.[8] After almost four years of complying with his pre and post-trial supervision conditions, Mr. Wynder, with the District Court's permission, surrendered to the Bureau of Prisons on June 7, 2024.

## Summary of Argument

Mr. Wynder never had a chance. His trial counsel was suffering from an aggressive and degenerative brain disease which *per se* prevented appellant from receiving a fair trial. Moreover, counsel's performance was objectively deficient under the circumstances. Finally, appellant was deprived of Due Process and the effective assistance of counsel by his sentencing attorney, who admitted having a conflict of

---

[8] *See*, Bureau of Prisons, inmate regis. no. 88067-055, accessible at: https://www.bop.gov/mobile/find_inmate/byname.jsp#inmate_results (site visited, July 1, 2024).

interest stemming from his decades-long friendship with trial counsel, not requesting a hearing regarding the capacity of trial counsel to provide effective assistance of counsel. A remand is in order.

Directive 12, promulgated by the New York City Comptroller's Office to regulate pension agreements, provides for a broad range of permissible expenses in overseeing an annuity fund. Mr. Wynder depended on these terms. Despite this, the District Court erroneously ordered restitution of $529,000 in favor of union members, based strictly on the total amount withdrawn from the annuity fund. However, there was insufficient evidence of impropriety in paying for insurance premiums and other expenses. Further, the documentary evidence established thousands of dollars, paid by LEEBA to auditors, accountants and attorneys, which were not considered by the court in issuing its restitution order. Counsel's inaction on this issue further demonstrated ineffective assistance of counsel. This also constituted plain error, compelling a remand.

## Argument

**Point I**

**The appellant was deprived of his constitutional right to the effective assistance of counsel.**

Mr. Wynder was deprived of his Sixth Amendment right to the effective assistance of counsel, both during and after trial. First, Mr. Wynder's trial attorney was suffering from a degenerative brain disease which *per se* deprived appellant of effective assistance of counsel and a fair trial. Second, based on all of the circumstances, appellant was deprived of effective assistance by his attorney's objectively unreasonable decisions and omissions, not reasonably attributable to trial strategy. Thirdly, Mr. Wynder's sentencing counsel was obliged to seek a hearing and address the capacity of trial counsel to have conducted the trial. Because of an admitted conflict of interest, sentencing counsel failed to adequately represent the appellant.

A. <u>Standards of review and ineffective assistance of counsel</u>

When faced with claims of ineffective assistance of counsel on direct appeal, this Court may do one of three things: (1) decline to hear the claim, permitting the litigant to raise the issue in a subsequent 28

29

U.S.C. § 2255 petition; (2) remand the claim to the district court for necessary fact-finding; or (3) decide the claim on the present record. *United States v. Adams*, 768 F.3d 219, 226 (2d Cir. 2014) (per curiam), citing *United States v. Tarbell*, 728 F.3d 122, 128 (2d Cir. 2013); *see also*, *United States v. Morris*, 350 F.3d 32, 39 (2d Cir. 2003).

To prevail on an ineffective assistance claim, a defendant must show counsel's representation fell below an objective standard of reasonableness, and that the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687-697 (1984); *United States v. Freeman*, 17 F.4th 255, 265-266 (2d Cir. 2021).

The first prong of *Strickland* "requires [a] showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. However, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690-691. This is true even where counsel adopts "a course of action (or inaction) that seems risky, unorthodox or downright ill-advised." *Tippins v. Walker*, 77 F.3d 682, 686 (2d Cir. 1996).

"The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. This includes the ABA Standards for Criminal Justice (Defense Function), 4-1.1(a), which requires compliance with the ABA Model Rules of Professional Conduct ("Model Rules") as an objective basis for evaluating reasonableness. *Strickland*, 466 U.S. at 688-689.

The Model Rules instruct that "[a] lawyer shall provide competent representation to a client. [This] requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." *See*, Model Rule 1.1. Further, "a lawyer… shall withdraw from the representation of a client if: (1) the representation will result in violation of the Rules of Professional Conduct or other law; [or] (2) the lawyer's physical or mental condition materially impairs the lawyer's ability to represent the client…" *See*, Model Rule 1.16 (a).

Finally, the constitutional right to the assistance of counsel "contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests." *United States v. Curcio*, 694 F.2d 14,

31

27 (2d Cir. 1982), citing *Glasser v. United States*, 315 U.S. 60, 70 (1942). Indeed, the Sixth Amendment embraces a right to effective assistance, which includes the right to be represented by an attorney who is free from conflicts of interest. *United States v. Cain*, 671 F.3d 271, 293 (2012), citing *Wood v. Georgia*, 450 U.S. 261, 271 (1981).

B.    Counsel at trial

1.    ***Per se ineffective assistance of counsel***

a.    *The degenerative brain disease: CJD*

Mr. Wynder's trial attorney, George Goltzer, was afflicted with a fatal and rapidly degenerative brain disease called Creutzfeldt-Jakob Disease ("CJD"), which undermined counsel's ability to represent Mr. Wynder and deprived him of a fair trial. Though his associate attorney was physically present, with the exception of announcing some juror peremptory challenges, *see*, A 468, 563-567, Mr. Goltzer handled everything in court.

What wasn't known during trial was that Mr. Goltzer was suffering from CJD, sometimes described as a form of "mad cow" disease, a rare and rapidly worsening brain disorder, which changes

brain tissue, affecting muscle coordination, thinking and memory.[9] This is an aggressive, untreatable and uncurable disease. As the NYS Department of Health has recognized, "[p]eople with CJD develop dementia and quickly deteriorate mentally. Other symptoms may include… the inability to speak. Approximately one-half of the individuals diagnosed with CJD die within six months of the time their symptoms began; **by one year 90 to 95 percent have died**." (emphasis added).[10]

Individuals afflicted with CJD may bypass normal procedures in seeking disability benefits from the Social Security Administration ("SSA"). Along with diseases such as ALS / Parkinsonism Dementia Complex, CJD victims qualify for the SSA compassionate allowance

---

[9] *See*, Centers for Disease Control and Prevention, "Creutzfeldt-Jakob Disease, Classic (CJD)," https://www.cdc.gov/prions/cjd/index.html (describing CJD as "a rapidly progressive, invariably fatal neurodegenerative disorder... the estimated annual incidence in… the United States has been reported to be about one case per million population.") (site visited, April 5, 2024).

[10] *See*, NYS Department of Health, "Creutzfeldt-Jakob Disease," accessible at: https://www.health.ny.gov/diseases/communicable/creutzfeldt-jakob/fact_sheet.htm#:~:text=Approximately%20one%2Dhalf%20of%20the,to%2095%20percent%20have%20died (site visited, April 12, 2024).

program in securing benefits.[11] CJD destroys brain cells, effectively turning the brain into a sponge.[12] Its common symptoms are dementia, confusion, memory loss and personality changes. *Id*. In the later stages, one's ability to speak is impacted. *Id*. A biopsy of the brain is the only way to diagnose CJD with certainty. *See again*, WebMD site, *supra* (under "Diagnosis" section). This explains why Mr. Goltzer's treatment in March and August of 2023 did not result in a CJD diagnosis.

The requirement of reasonableness in a defense attorney's conduct, *Freeman*, 17 F.4th at 265-266, is premised on counsel's *capacity* to fully reason. An attorney suffering from CJD, however, has no business being responsible for a criminal defendant's liberty. Analogous to being highly intoxicated, asleep or under the influence of drugs, an attorney with CJD during trial is present in name only. *See, e.g.*, *Tippins*, 77 F.3d at 683 (where counsel slept for "substantial"

---

[11] *See*, Social Security Administration site, Compassionate Allowances Conditions, with list of qualifying diseases, accessible at: https://www.ssa.gov/compassionateallowances/conditions.htm (site visited, July 1, 2024).

[12] *See*, WebMD, "What is Creutzfeldt-Jakob Disease" (medically reviewed by Christopher Melinosky, MD, on May 12, 2023), accessible at: https://www.webmd.com/brain/what-is-creutzfeldt-jakob-disease (site visited, April 10, 2024).

portion of trial); *but see*, *United States v. Kaid*, 502 F.3d 43, 46-47 (2d Cir. 2007) (recognizing *per se* ineffective assistance rule only for unlicensed representation and counsel being implicated in the defendant's crime) (internal citations omitted).

Indeed, an attorney suffering from CJD should not be afforded the *Strickland* presumption of having acted pursuant to a legitimate *strategy* in making courtroom decisions. Every material trial decision is undermined, from the choice of words for a summation to the decision whether to cross examine a witness: was it just a failed trial strategy or an attorney in the grip of a debilitating brain disease?

For instance, while "[d]ecisions about "whether to engage in cross-examination… are … strategic in nature" and generally will not support an ineffective assistance claim," *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002), this is premised on counsel possessing the full bandwidth to make such nuanced decisions. *See*, *Tippins*, 77 F.3d at 687 (recognizing "the buried assumption in our *Strickland* cases is that counsel is present and conscious to exercise judgment, calculation and instinct, for better or worse. But that is an assumption we cannot make when counsel is unconscious at critical times.").

An attorney suffering from CJD cannot be deemed competent to represent a criminal defendant under Model Rule 1.1. The disease literally punches holes in the brain, causing the rapid deterioration of an individual's ability to reason. *See again*, CDC and NYS Dep't of Health cites, *supra*. Where counsel suffers from CJD, the *Strickland* prejudice prong has been effectively satisfied. *Tippins*, 77 F.3d at 687 (concluding that "where the adversary nature of the proceeding was subject to repeated suspensions, there is little difference between saying that prejudice will be presumed and saying that prejudice has been demonstrated").

Mr. Wynder was deprived of his fundamental right to a trial attorney free of a disease undermining counsel's capacity to present a constitutionally sufficient defense. Not remanding a criminal conviction where counsel was afflicted with CJD will undermine the public's already fragile confidence in our system.

> b. *This Court should consider the December 26, 2023 email in furtherance of fairness, justice and judicial efficiency*

As noted, because of his illness, Mr. Goltzer was relieved as counsel on August 3, 2023. On December 26, 2023, about three weeks

prior to sentencing, Mr. Goltzer died of CJD. That evening, the Goltzer

family sent out a quick email to friends, colleagues and courts *(upon*

*information and belief, including this Court)*, announcing Mr. Goltzer's

passing. A 1786. Towards the bottom of the email was a request for

donations to the CJD Foundation and a link to its website. *See*,

Creutzfeldt-Jakob Disease Foundation, Inc., accessible at:

https://cjdfoundation.org/donate/ (site visited, April 5, 2024). A 1787-

1790. This information should be considered as part of this appeal.

    This Court possesses the inherent discretionary authority to

consider evidence not traditionally part of the appellate record under

extraordinary circumstances were doing so will further fairness, justice

and judicial efficiency. *In re MacMillan, Inc.*, 107 F.3d 3, 1997 U.S.

App. Lexis 7050, 1997 U.S. App. Lexis 4971, at *2-3 (2d Cir., Feb. 20,

1997) (summary order recognizing that "[a]bsent extraordinary

circumstances, an appellate court will not enlarge the record to include

evidentiary material not presented to the trier of fact"); *Ross v. Kemp*,

785 F.2d 1467, 1475 (11th Cir. 1986) (considering, among other things,

the interests of justice and judicial efficiency in determining whether to

exercise its discretionary authority to supplement the record in a habeas context).

These principles have been applied in the habeas and criminal contexts. *See also*, *Alnutt v. United States*, 588 Fed. Appx., 45, 47, 2014 U.S. App. Lexis 23810, 2014 W.L. 7182147 (2d Cir. 2014) (quoting *MacMillan*); *United States v. Parker*, 745 Fed. Appx. 431, 432, 2018 U.S. App. Lexis 35807, 2018 W.L. 6720028 (2d Cir. 2018) (quoting *MacMillan*, citing only to *Alnutt*); *see also*, *United States v. Aulet*, 618 F.2d 182, 186-187 (2d Cir. 1980) (permitting the government under Fed. R. App. P. 10(e) to supplement the record where "injustice might otherwise result" regarding Jencks Act material) (internal citation omitted).

The record corroborates the accuracy of the December 26, 2023 email. Noone will dispute Mr. Goltzer passed away on that date.[13] Counsel recognized at the January 17, 2024 sentencing that Goltzer passed away the month before after suffering a serious illness. A 1942. Mr. Goltzer collapsing in March 2023 in court, A 1942, his August 2023

---

[13] S*ee*, New York Times, George Goltzer obituary, accessible at: https://www.legacy.com/us/obituaries/nytimes/name/george-goltzer-obituary?id=53946106 (site visited, April 13, 2024).

correspondence to the trial court explaining the deterioration of his brain and his inability to function as an attorney, SD 1-2, and his objectively unreasonable performance during the May 2023 trial *(as addressed below)*, are all wholly consistent with his dying of CJD on December 26, 2023.

The timeline for Mr. Goltzer having the disease matches up as well. As noted, CJD usually kills *within a year*.[14] While appellant's trial counsel filed a few substantive motions and pleadings in June of 2022 (A 169-196 *(with one filed by his associate)*; A 226-227), these were filed approximately 18 months prior to Mr. Goltzer's death, in other words, at least 6 months before his affliction with CJD. Moreover, approximately *4 and half months* before his death (in August 2023), counsel withdrew from the case. Approximately *7 months* prior to his death (in May 2023) was the trial. Approximately *9 months* prior to his death (in March 2023), Mr. Goltzer collapsed in

---

[14] *See*, WebMD, "What is Creutzfeldt-Jakob Disease" (medically reviewed by Christopher Melinosky, MD, on May 12, 2023), accessible at: https://www.webmd.com/brain/what-is-creutzfeldt-jakob-disease (site visited, April 10, 2024).

court. The timing of these events is consistent with the email being accurate in all respects.

Indeed, judicial resources will be preserved by this Court considering the December 26th email. Accepting this information provides the Court a sufficient basis to remand directly for a hearing without requiring that a habeas petition be filed. This will save the District Court resources in having to review and evaluate a habeas petition (along with the government's responses) seeking the obvious relief of conducting a hearing. Conversely, because of these unique circumstances, this Court's narrow consideration of this email will not result in the flood gates opening in future appellate litigation.

Considering the email will also further the interests of justice, as Mr. Wynder's assigned attorney who appeared at sentencing was, as explained herein, operating under a conflict of interest and unjustifiably failed to properly make a record of these events and seek a hearing.

Furthermore, there is practically no chance that the email contains falsified information. The document, forwarded to appellate counsel in April of this year by Mr. Goltzer's associate counsel (Ying

Stafford), is in the common format of an email, delineating a date and a sender who has the last name of the deceased trial counsel. The document has all the hallmarks of authenticity. It would strain all credulity to assume it was fabricated.

Naturally, the weight this Court assigns to this brief email is a matter of its discretion, thus reducing any undue prejudice to the government.

Finally, the email codifies a pre-judgment event, consistent with the rest of the appellate record, which is part of a highly relevant and *extraordinary circumstance* -- where a trial attorney withdraws from representing a client after a jury verdict (because of a serious brain-related illness) and dies prior to sentencing.

Based on the above, the contents of the December 26th email relative to the date and cause of Mr. Goltzer's death should be considered by this Court regarding the instant appeal.

       c.   *Trial counsel's conduct and attendant circumstances corroborate the existence of this disease*

The record corroborates Mr. Goltzer suffering from CJD at the time of Mr. Wynder's trial.

To begin with, the objectively unreasonable actions and omissions by counsel during trial corroborate his suffering from CJD. These are set out in **Point I (D)(2)** below.

The events both preceding and following the May 2023 trial also bookend trial counsel's medical plight. As noted, at the beginning of the first attempt at jury selection, on March 6, 2023, Mr. Goltzer passed out, requiring medical attention. The docket entry for that date indicates District Court believed granting a continuance of the trial date was "needed due to health necessities of one of the lead defense counsel." SDNY, Dkt. 187. While there was no CJD diagnosis following the March 2023 collapse, CJD is often misdiagnosed as a different neurological infliction.[15]

Mr. Goltzer's fate as trial counsel after he passed out was uncertain in the weeks following the incident. *See again*, A 331-333 (March 16, 2023 proceedings; *see* comments from Mr. Goltzer, the

---

[15] *See*, National Library of Medicine, N. Chitravas, MD, R. Jung, MD, D. Kofskey, J. Blevins, P. Gambetti, MD, R. J. Leigh, MD, M. Cohen, MD, "Treatable Neurological Disorders Misdiagnosed as Creutzfeldt-Jakob Disease," accessible at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3170496/ (site visited, April 25, 2024).

government and the court). After consulting with medical personnel in April, Goltzer indicated he could continue. A 336. Jury selection commenced again on May 22, 2023.

On August 3, 2023, just over two months after the May 30th guilty verdicts, Mr. Goltzer informed the District Court, via correspondence, that he was being examined by a neurology team at Mount Sinai Hospital and could not competently represent appellant as his health was rapidly deteriorating. SD 1. He feared having a brain tumor. His speech had become slurred and could not properly argue a case. SD 1.

The timing and attendant circumstances support appellant's position that counsel was suffering from CJD during trial. Indeed, Mr. Goltzer had it before, during and after the trial proceedings.

> ### d. A remand for a hearing should be ordered regarding whether counsel suffered from CJD at the time of trial

Should the Court not find a sufficient record to determine that appellant was afforded ineffective assistance of counsel, a remand for a fact-finding hearing should be ordered. Where an ineffective assistance issue is a simple one, this Court has remanded for fact-finding to flesh out the issue. *See*, *United States v. Leone*, 215 F.3d 253, 256 (2d Cir.

43

2000) (where counsel purportedly failed to advise defendant of the difference between two plea agreements).

While other components of this issue may also be properly addressed, if remand is ordered here, the primary focus would be simply confirming that trial counsel was suffering from CJD during trial. Once established, no court could reasonably hold any confidence in the validity of this conviction, nor with trial counsel's ability to comply with Model Rule 1.16(a)(2) (requiring timely withdrawal from representation where a physical or mental condition materially impairs one's ability to handle a case). This novel issue presents a "compelling reason" to deviate from this Court's practice of declining to address ineffective assistance issues while permitting a subsequent § 2255 habeas petition filing. *See e.g.*, *United States v. Turner*, 2023 U.S. App. Lexis 20674, *12-13, 2023 W.L. 5091187 (2d Cir. 2023) (declining to find compelling reason).

Moreover, this Court's decisions to not order a remand to address ineffective assistance issues, many of them being summary orders, are usually premised on arguments that, unlike ours, neither require a hearing for their resolution nor are apparently meritorious on their

44

face. *See*, *e.g.*, *United States v. Perevoznikov*, 2024 U.S. App. Lexis 8060, at *2-4 (2d Cir. 2024) (where counsel allegedly failed to emphasize the harsh conditions defendant faced while in custody and also failed to object to consecutive sentencing); *United States v. Sommerville*, 2024 U.S. App. Lexis 7102, at *10-12, 2024 W.L. 1266227 (2d Cir. 2024) (where counsel allegedly committed a host of mistakes, including not providing defendant a copy of his PSR); *United States v. Romero*, 2024 U.S. App. Lexis 4925, at *1-2, 2024 W.L. 886197 (2d Cir. 2024) (where counsel allegedly failed to advise defendant to delay federal sentencing because of a pending state matter).

If Mr. Wynder was compelled to file a habeas petition, a hearing would certainly be warranted. Judicial resources, however, as noted above, are better spent not requiring the appellant to litigate through the habeas process, which has stringent requirements for filing any successive petitions. *See again*, *Leone*, 215 F.3d at 256-257 (recognizing the strict 28 U.S.C. § 2244(b)(3) standards in remanding for an ineffective assistance hearing).

Under these unique circumstances, a remand should be ordered.

45

### 2. *Ineffective assistance of counsel based on the totality of the circumstances at trial*

Should the Court decline to consider the December 23, 2023 email, ineffective assistance of counsel is still established under the *Strickland* totality of the circumstances standard based on this record. These circumstances include counsel: (a) not substantively pursuing a recently stated defense theory at trial, (b) lodging only two minor objections to testimony, (c) not cross-examining most of the government witnesses, despite several of them being critical, (d) not properly investigating financial documents in evidence, and (e) presenting an abrupt summation that was damaging to the defense.

### a. Inaction

As set out above, trail counsel abandoned his recently stated theory of the defense that the City had an agenda in saving resources by halting would-be payments into LEEBA's annuity fund, as opposed to placing owed money in escrow because of suspected fraud. *See* A 290, 310-311. Counsel did very little during trial. Mr. Goltzer lodged just two objections, both of them minor, during testimony. *See*, A 707, 974. He ultimately moved into evidence, with the government's consent,

seven exhibits without calling a witness. A 1199-1200. And as set out

below, he barely used his own exhibits.

>  b.  *Failure to cross-examine witnesses and failure to review evidence*

As noted, Mr. Goltzer cross-examined just seven of the

government's fifteen witnesses. While foregoing cross-examination

might at times constitute sound courtroom strategy,[16] a number of

Goltzer's omissions were objectively unreasonable. Some examples will

help illustrate.

Mr. Goltzer decided not to cross-examine SPS assistant Tracey

Guy, who administered withdrawals from LEEBA's annuity plan. After

affirming appellant's friendship with his purported co-conspirator,

identifying an email from Ascensus to appellant, and identifying Mr.

Wynder's signature on three invoices totaling $40,000, counsel for

codefendant Brown naturally cross-examined this witness, A 715, 720-

721, 723-724, 727-732, during which counsel affirmed appellant's

---

[16] *See*, *The Art of Cross-Examination*, Francis L. Wellman, Ch. 7
("Silent Cross-Examination"), 1903, 1904, 1923 and 1936 by Macmillan
Publishing Co.; 1962 by Collier Books (4th ed.).

purportedly incriminating signature. A 730. Yet despite Directive 12 explicitly permitting insurance, attorney, accounting and auditing fees as valid expenses to be withdrawn from an annuity fund, A 1413-1415, 1427-1428, and despite there being numerous checks paid out (in evidence) for just those reasons, *see*, **Point II** below, Mr. Goltzer elected to forgo cross-examination. A 732.

Another lost opportunity was witness Jacqueline Perez, who also worked for SPS. She confirmed the personal and professional relationship between Wynder and Brown, as well as appellant's signature on a $25,000 invoice. A 736, 745. Once again Mr. Goltzer waived cross-examination. A 747. Not surprisingly, counsel for Brown cross-examined this witness. A 747-755.

Another example is witness Russell Furey, who supervised the independent audit of LEEBA, testifying to Wynder and Brown *not cooperating*. *See*, *e.g.*, A 899-901, 908-911. How could this testimony not be important enough to at least mitigate before the jury? What happened to the defense theory of the case? Though cross-examination has long been deemed "the principal means by which the believability of a witness and the truth of his [or her] testimony are tested," *Davis v.*

48

*Alaska*, 415 U.S. 308, 316 (1974), Mr. Goltzer once again declined. *See*, A 947.

What makes this inaction even worse is that Mr. Furley testified to appellant and LEEBA failing to pay its $17,000-plus December 2018 auditor bill for six months. A 941-947. For some reason, trial counsel failed to alert the jury that LEEBA had in fact paid the auditor more than $70,000 in fees between September 2016 and November 2018.[17] It strains all credulity to brush aside this glaring omission as a potential trial strategy. If counsel knew of this information, he would be compelled to act on it.

Perhaps counsel's most blatant omission was not confronting FBI special agent, Katrina Laperutawa, who presented a *de facto* summation of the entire prosecution case, complete with: **(a)** a chart showing the transfer of money from LEEBA's annuity fund into its operating account (controlled by Mr. Wynder); **(b)** testimony

---

[17] In **Point II** below is an itemization of pertinent checks written by appellant and LEEBA as part of government's exhibits 807, 811 and 816, including 21 separate checks to the independent auditor totaling more than $70,000.

addressing appellant's and LEEBA's battles with New York City; **(c)** the appellant's characterization of so-called "administrative expenses" in facilitating withdrawals from the annuity fund's custodian; and **(d)** testimony showing the defendants' emails and text messages addressing amounts, invoices and purported reasons for their withdrawals. A 1020-1031, 1125-1160.

What a perfect opportunity to counteract the *government's* theory with the *defense* theory, capsulized in defense exhibits B through F. *See*, SD 3-65. These exhibits synthesized where the annuity fund withdrawals were actually spent. The only problem: trial counsel, for some reason, waited until all the trial testimony was *complete* before moving these stipulated exhibits into evidence. A 1199-1201. Why?

What excuse could there be for a reasonable defense attorney to not at least mitigate *some* of the purportedly incriminating information proffered by Agent Laperutawa? This was a testimonial overview -- effectively covering the government's entire case -- perhaps the most consequential of the government's fifteen witnesses. But once again it was radio silence from the Goltzer defense table. *See*, A 1160. It was as if the defense theory of the case never existed.

50

At least codefendant Brown's attorney cross-examined Agent Laperutawa on potential conversations occurring between the parties *outside* of the government's charts, A 1164-1165, thus planting the seed that the jury was not receiving the full picture of the *codefendant's* potential culpability. While the rest of Brown's cross-exam sought distance from the appellant's purported culpability, A 1164-1169, 1176-1177, Brown's attorney at least had the intuition to remind the jury they may not have the entire story.

One last example: ADP analyst, Michael Doran, testified regarding the logistics of administering payroll tax issues for LEEBA, as well as the LEEBA treasurer's conduct in administering checks *outside* of the payroll process. *See*, A 1040-1075. This was critical to the tax evasion counts. Again, no cross-examination. *See*, A 1075.

### c. *Other conduct and the summation*

Trial counsel's attempt to cross-examine Ms. Mullany of the City's Comptroller's Office on the broad expense definitions under Directive 12 was a disaster:

> [Assistant U.S. Attorney]: Your Honor, is there a question here?
>
> THE COURT: Yes. Mr. Goltzer, is there a question?
>
> BY MR. GOLTZER:

51

Q. You are familiar with these administrative expenses?

A. Yes.

Q. And these administrative expenses were actually <u>applied for</u> by Mr. Wynder and LEEBA?

A. Sorry. Can you repeat that?

Q. Were these expenses that I have just read to you, <u>applied for by LEEBA</u>?

A. <u>I don't understand what you mean by applied for</u>.

THE COURT: <u>I don't understand the question</u>.

Q. Did LEEBA <u>apply for administrative expenses</u>?

THE COURT: <u>Apply to whom</u>?

Q. <u>To the City, to the administrative fund</u>.

A. <u>I don't understand the question either</u>, to say that they applied for. LEEBA could incur --

THE COURT: Listen. If you understand the question then you need to answer it. If you don't understand the question, just say you don't understand it.

THE WITNESS: OK.

THE COURT: And leave it at that.

THE WITNESS: OK. Sorry.

THE COURT: All right.

BY MR. GOLTZER:

Q. You are familiar with the concept of appropriate administrative expenses?

A. Yes.

*****

Q. And are these appropriate administrative expenses?

A. These are appropriate categories of administrative expenses.

Q. Let's go through them. <u>Fringe benefits</u>?

THE COURT: <u>Wait a minute. What's the question</u>?

Q. Are fringe benefits an appropriate expense?

THE COURT: You just heard the witness' answer. The witness' answer was that these are appropriate categories of expenses. That's what the witness testified to. Now frame your question.

Q. Is that the same answer with respect to page 19 of 22? Are those appropriate administrative expenses?

THE COURT: That isn't the same answer. That was not the witness' answer so it would be a different answer if she said "yes."

Q. Are the expenses listed on page 19 of 22 appropriate administrative expenses?

A. Yes, they are appropriate categories of administrative expenses.

A 836-838 (emphasis added). Just brutal. This was the most critical issue for the defense -- whether the definitions of Directive 12 encompass the administrative expense transfers in question. But all the jury could take from this stop-and-go exchange was a confused and awkward attorney; the importance of the Comptroller's Office acknowledging the administrative expenses in question would be lost on any audience.

53

A tax-related stipulation (gov. exhib. 3019) was read to the jury, indicating that Mr. Wynder had attempted to work out installment plans with the IRS between 2010 and 2016. A 1182-1183. Five of these eight stipulated events predate the tax-related charges. Why Mr. Goltzer thought this was so helpful (despite it showing appellant to be in debt for years, thus creating a motive to *evade* taxes) that he read it verbatim to the jury in summation, A 1283-1285, is unclear. If this was an attempt to *mitigate* tax evasion allegations, it was inept at best.

Despite having moved into evidence (with the government's consent) detailed summary lists addressing where the withdrawn money from 2015 through 2019 was utilized for union purposes, *see* SD 3-65, counsel in summation merely suggested that the jury look at these ***60 pages*** of columns and numbers themselves. A 1288 ("And I want you to take a look at them…"). Already tasked with having to (purportedly) review more than 6,000 pages of exhibits – and without having been provided a chart, a blown-up summary, or some sort of specific direction -- of course the jury declined.

Finally, Mr. Goltzer's attempt in summation to articulate his white-collar client's lack of financial skills -- without burying his

chances for success -- became an uphill climb to say the least. *See, e.g.*, A 1292-1294 (where counsel observed that "Ken Wynder isn't somebody you probably want to loan money to. He isn't somebody you'd want to be a business partner with. But he's not guilty of these crimes…").

The jury was apparently unmoved by Mr. Goltzer's abrupt summation. A 1282-1293. Despite the more than two hundred exhibits moved into evidence, *see*, A 814-815, 1035-1036, 121-1211, totaling more than **6,000** pages, the jury returned guilty verdicts on all counts, after only deliberating for less than an hour (with, of course, no jury inquiries made). *See*, A 1400-1405, 2192-2194. Though codefendant Brown shared the same fate, as the trial attorney for the defendant with the lion's share of the allegations, A 41-55, was asleep at the switch, it should surprise no one that the ship carrying the codefendant was taken down just as quickly.

### 3. Post-trial ineffective assistance of counsel

On August 3, 2023, the District Court relieved Mr. Goltzer and assigned new counsel going forward. SD 1-2. On January 17, 2024, Mr. Wynder was sentenced with his substitute counsel at his side.

55

By sentencing, appellant's new attorney had been on the case for approximately five and a half months. Counsel demonstrated he knew of Mr. Goltzer's fate during the sentencing proceedings and had even interviewed individuals (likely the surviving members of appellant's trial team) who informed him of Mr. Goltzer's failed health and deficient trial performance. A 1942-1943.

While a sentencing memo was filed, A 1791-1836, no request for a fact-finding hearing was requested to determine (and ultimately confirm) Mr. Goltzer was suffering from CJD at the time of trial. Indeed, no substantive articulation for a lower sentence was presented regarding counsel's illness and deficient performance, factors that would have certainly impacted the need for the sentence imposed "to promote respect for the law." 18 U.S.C. § 3553(a). The reason for sentencing counsel's inaction is plain: he had a conflict of interest preventing him from substantively litigating any ineffective assistance of counsel issues. Counsel candidly acknowledged on the record that he "intend[ed] to ask th[is Court] to be relieved because [he] knew [Mr. Goltzer] for well over 40 years, both personally and professionally, and [did]n't want to be in a position to have to make certain allegations." A

56

1942 (emphasis added). In fact, counsel was "in [that] position" as he stood next to his client in court on January 17, 2024. Once again in these proceedings, Mr. Wynder was without a true advocate at his side.

Having spoken to individuals who observed the trial (likely including Mr. Goltzer's associate counsel, who was required in the August 3rd order to remain on the case, A 1785) and determining that Mr. Wynder had a colorable ineffective assistance of counsel claim, A 1942-1943, the sentencing attorney simply put his blinders on and powered through. At that moment, no one was representing Mr. Wynder's interests in assuring his trial proceedings were fair. A record needed to be made regarding the nature of Mr. Goltzer's illness and a hearing should have been requested to determine whether Goltzer had the capacity in May of 2023 to provide effective assistance of counsel. As the sentencing attorney squarely demonstrated, A 1942, however, it's a hardship to litigate issues that may reveal in a negative light your friend of four decades.

The sentencing attorney knew that Mr. Goltzer had died the month before of the same illness he was suffering from during trial. A 1941-1942. He also knew that Goltzer had passed out during the first

attempt at jury selection. *Id*. Mr. Wynder was entitled to conflict-free counsel to *substantively* litigate any ineffective assistance of counsel issues. *See generally*, *Curcio*, 694 F.2d at 27. Sentencing counsel, who had months to consider his options, had no business shutting down this issue. Making a vague motion for bail pending appeal, A 59-66, may have eased counsel's conscience in protecting the good name of his deceased friend -- but it fell far short of what the Constitution requires. If anything, the specious bail motion revealed counsel's vailed attempt to *sort of* advocate for his client.

In sum, the sentencing attorney abandoned issues he believed, rightly so, to be of merit. Instead of remaining on the case and partly arguing for a lower sentence stemming from a conviction he knew was flawed, counsel was ethically mandated to move to withdraw. *See*, Model Rule 1.7(a)(2). As it is, this Court should remand with new counsel assigned to provide appellant the opportunity to request a hearing on his trial counsel's capacity to provide effective assistance of counsel.

**Point II**

**The District Court erroneously ordered restitution based on withdrawn funds that were permissible expenses under the New York City Comptroller's directive.**

The District Court imposed restitution of $529,000 in favor of the LEEBA union members. A 1950-1953, 1960. This order failed to consider thousands of dollars spent on legal counsel, insurance, auditing and accounting fees, all permissible expenses under Directive 12.

Trial counsel, who was operating under a degenerative brain disease, failed to substantively litigate the specifics of the expense issues during trial. Moreover, sentencing counsel, who was operating under a conflict of interest, failed to investigate this issue and then object to the restitution order below. This inaction constituted ineffective assistance of counsel. The court's factual finding was clearly erroneous, an abuse of discretion and plain error.

A. <u>Standards of review and restitution in general</u>

"In the case of restitution orders, [this Court] review[s] issues solely of law *de novo*, findings of adjudicative fact for clear error, and the multi-factor balancing aspects of such an order for abuse of

discretion." *United States v. Cadet*, 664 F.3d 27, 34-35 (2d Cir. 2011),

citing *United States v. Jaffe*, 417 F.3d 259, 263 (2d Cir. 2005); *see also*,

*United States v. Desnoyers*, 708 F.3d 378, 388-389 (2d Cir. 2013).

District courts have no inherent authority to order restitution.

*United States v. Helmsley*, 941 F.2d 71, 101 (2d Cir. 1991). It may be

ordered only for losses caused by an offense of conviction, *United States*

*v. Varrone*, 554 F.3d 327, 333 (2d Cir. 2009), and only when authorized

by statute. *Helmsley*, 941 F.2d at 101. Title 18 of U.S.C., § 3663A(c)(2)

requires that there be identifiable victim(s) who have suffered a

physical injury or "pecuniary loss." Section 3663A(a)(2) defines "victim"

as "a person directly and proximately harmed <u>as a result of the</u>

<u>commission of the offense</u> for which restitution may be ordered…"

(emphasis added). Pursuant to § 3664(e), any dispute as to the amount

of restitution must be resolved by the District Court by a

preponderance of the evidence.

Where an appellate claim is forfeited, the issue is reviewed under

the plain error standard. To satisfy these parameters under Federal

Rule of Criminal Procedure 52(b): (1) there must be an actual error

that was forfeited, (2) the error must be plain or obvious, (3) the error

must affect substantial rights, and (4) the error must seriously affect the fairness, integrity, or public reputation of the judicial proceedings. *See*, *United States v. Olano*, 507 U.S. 725, 732 (1993); *United States v. Murphy*, 942 F.3d 73, 84 (2d Cir. 2019).

For an error to be plain, it must be "clear or obvious," rather than subject to reasonable dispute. *United States v. Montague*, 67 F.4th 520, 534 (2d Cir. 2023). Moreover, an error may be plain even absent binding case law if it violates an absolutely clear legal norm -- for example, the plain language of a statutory provision. *Montague*, 67 F.4th at 535 (internal citation omitted). An error affects a defendant's "substantial rights" if it is "prejudicial and it affected the outcome of the case." *Id.* at 536 (internal citation omitted). Finally, this Court "[a]pplies this standard less "stringently in the sentencing context, where the cost of correcting an unpreserved error is not as great as in the trial context."" *Pereira-Gomez*, 903 F.3d 151, 161, n.12 (2d Cir. 2018), citing *Jones*, 878 F.3d at 14-15; *see also*, *United States v. Gamez*, 577 F.3d 394, 397 (2d Cir. 2009) *(per curiam).*

B. The restitution order was erroneous

The government believed there were 17 unauthorized withdrawals from the annuity fund between 2012 and 2019, totaling $529,000. A 1157; SD 5730. Accordingly, the District Court ordered Mr. Wynder to pay $529,000 to "union members and retirement accounts." A 1936, 1950-1951; PSR ¶¶ 135-138. The order, however, did not account at all for what constituted permissible expenses from the annuity fund under Directive 12 (def. exhib. A, SD 1410), such as insurance premiums and attorney, auditor and accounting fees.

### 1. Directive 12

Under Directive 12, § 3.4(3) requires that salaries, fees and commissions must not be excessive or unreasonable. The funds, according to § 3.4(1) are restricted to "expenditures and programs that directly or indirectly benefit fund members." *See also*, Annuity Plan, § 13.04 (recognizing funds from the Plan may be not be withdrawn "for purposes other than for the exclusive benefit of the Participants and their Beneficiaries and to defray reasonable expenses of administration").

Section 2.3(2) of the Directive indicates that "[i]nsurance premium payments, less retention charges" are a "[b]enefit expense." Section 2.3(4)(a) indicates that "[s]alaries or other payments to… [a]ttorneys who provide direct legal services to members" are also a benefit expense. Moreover, § 2.4(4) describes "[f]ees paid to third party or Fund administrators for administrative purposes" as an "[a]dministrative expense." The same is true under § 2.4(5) for "[m]iscellaneous fees and commissions." Appendix A to Directive 12 lists appropriate categories for expenses, A 836-838, 855-856, including accounting fees, legal fees, insurance, fringe benefits for employees, travel allowance and salaries. A 1413-1415, 1427-1428.

The government's evidence at trial may support a finding that appellant fell short of complying with all of the record-keeping requirements of Directive 12. *See*, *e.g.*, §§ 9.1 and 9.2 (requiring schedules for "Benefit" and "Administrative" expenses be maintained); § 3.2 (addressing records of Benefit Funds); § 3.8 (addressing shared expenses); § 6.1(5) (also addressing shared expenses). But unlike §1343, charged herein, Directive 12 is not a criminal statute. Accordingly, not complying with the record keeping rules of the

63

Directive, however well intended they may be, does not establish a violation of the wire fraud or conspiracy statutes. Rather, the broad definitions of the Directive squarely undermine the theory the government's case. A 833-837.

### 2. Insurance, attorney, auditor and accounting expenses

By way of example, in April and May of 2019, Brown communicated with Mr. Wynder regarding an outstanding union insurance bill with Standard Insurance. Wynder and Brown coordinated a withdrawal from Ascensus to a LEEBA account for $40,000. The reason given for the transaction was an administrative and management cost. A 876-878, 881-887, 1141-1145. Not surprisingly, Brown's administrative assistant was not instructed to keep the transaction secret. A 887. While Ascensus believed paying insurance premiums out of the annuity fund by LEEBA would not be proper if "unassociated" with the annuity plan, A 696-697, § 3.4(1) of the Directive indicates Benefit Funds "expenditures" may "indirectly" benefit fund members. A 1415. Union insurance premiums, at the very least, indirectly benefit LEEBA annuity fund owning members.

Moreover -- in addition to defense exhibits B through F (SD 3-65), which *(though not utilized during testimony by trial counsel)* set out the path of the withdrawn annuity funds -- below is a non-exhaustive list of checks written out of the LEEBA accounts (signed by the appellant) that qualify as appropriate Directive 12 expenses under sections 2.3 or 2.4: [18]

| **Check #** | **Date** | **Payee** [19] | **Amount** | **Record Cite** [20] |
|---|---|---|---|---|
| 2220 | 8/21/14 | Atty | $2,000 | SD-3254 |
| 2245 | 12/28/14 | Atty | $3,000 | SD-3263 |
| | | | | |
| 2253 | 5/1/15 | Atty | $3,000 | SD-3272 |
| 2278 | 6/1/15 | Atty | $2,500 | SD-3278 |
| 2288 | 6/18/15 | Atty | $3,000 | SD-3291 |
| 2307 | 9/4/15 | Atty | $3,000 | SD-3297 |
| 2328 | 9/28/15 | Atty | $3,000 | SD-3300 |
| 7377 | 10/21/15 | Atty | $2,500 | SD-1021 |

---

[18] For brevity's sake, this list only addresses legal, auditing and accounting services paid for. There were, of course, extensive payments also made for rent, insurance, healthcare and dental invoices during this time period.

[19] Also for simplicity's sake, with the exception of the independent auditor ("Koenig"), we are describing the general occupation of the payee of these checks, instead of specific names. "Atty" means attorney. "Acc'nt" means accountant.

[20] These bank records, all moved into evidence, have been submitted herein as separate files contained in a sealed disc exhibit (*again*, "SD __"). All of the checks are from government exhibits 807, 811 or 816, all of which are voluminous in nature.

| 7379 | 11/2/15 | Atty | $3,000 | SD-1032 |
|------|---------|------|--------|---------|
| 2341 | 12/15/15 | Atty | $3,000 | SD-3309 |
| 2342 | 12/20/15 | Atty | $3,000 | SD-3310 |
| | | | | |
| 131 | 2/3/16 | Atty | $5,000 | SD-1079 |
| 113 | 3/3/16 | Atty | $5,000 | SD-1095 |
| 119 | 4/15/16 | Atty | $5,000 | SD-1111 |
| 2401 | 4/28/16 | Atty | $2,500 | SD-3332 |
| 2402 | 5/6/16 | Atty | $2,500 | SD-3334 |
| 156 | 5/24/16 | Atty | $2,500 | SD-1133 |
| 157 | 6/3/16 | Atty | $2,500 | SD-1142 |
| 2432 | 6/29/16 | Atty | $5,000 | SD-3345 |
| 2453 | 8/1/16 | Atty | $5,000 | SD-3350 |
| 2473 | 8/29/16 | Koenig | $2,500 | SD-3358 |
| 2468 | 9/1/16 | Atty | $5,000 | SD-3358 |
| 232 | 9/30/16 | Koenig | $10,000 | SD-1214 |
| 183 | 9/29/16 | Atty | $5,000 | SD-1225 |
| 191 | 10/24/16 | Atty | $5,000 | SD-1257 |
| 249 | 11/30/16 | Atty | $5,000 | SD-1273 |
| 266 | 12/9/16 | Atty | $500 | SD-1294 |
| 285 | 12/28/16 | Atty | $5,000 | SD-1310 |
| 277 | 12/14/16 | Koenig | $1,220 | SD-1316 |
| | | | | |
| 290 | 1/4/17 | Koenig | $7,340 | SD-1317 |
| 291 | 1/4/17 | Koenig | $3,850 | SD-1318 |
| 304 | 2/2/17 | Atty | $12,645 | SD-1339 |
| 305 | 1/31/17 | Atty | $5,000 | SD-1340 |
| 310 | 2/1/17 | Koenig | $1,210 | SD-1350 |
| 307 | 2/1/17 | Koenig | $1,210 | SD-1351 |
| 313 | 2/1/17 | Koenig | $2,170 | SD-1352 |
| 306 | 2/1/17 | Koenig | $6,520 | SD-1353 |
| 315 | 2/6/17 | Atty | $500 | SD-1363 |
| 334 | 2/22/17 | Atty | $5,000 | SD-1381 |
| 351 | 3/30/17 | Atty | $5,000 | SD-1414 |
| 360 | 4/20/17 | Koenig | $1,250 | SD-1427 |
| 359 | 4/20/17 | Koenig | $10,330 | SD-1428 |
| 361 | 4/20/17 | Koenig | $1,310 | SD-1429 |
| 375 | 4/28/17 | Atty | $5,000 | SD-1444 |

| | | | | |
|---|---|---|---|---|
| 109 | 6/1/17 | Atty | $5,000 | SD-1474 |
| 129 | 6/26/17 | Atty | $5,000 | SD-1503 |
| 153 | 7/11/17 | Koenig | $950 | SD-1511 |
| 155 | 7/11/17 | Koenig | $2,000 | SD-1512 |
| 154 | 7/11/17 | Koenig | $630 | SD-1513 |
| 132 | 7/24/17 | Atty | $5,000 | SD-1519 |
| 391 | 8/1/17 | Atty | $7,500 | SD-1531 |
| 404 | 8/15/17 | Koenig | $3,000 | SD-1555 |
| 133 | 9/3/17 | Atty | $7,500 | SD-1572 |
| 138 | 9/15/17 | Atty | $10,000 | SD-1578 |
| 438 | 10/3/17 | Koenig | $3,000 | SD-1609 |
| 435 | 10/5/17 | Atty | $7,500 | SD-1610 |
| 125 | 10/30/17 | Atty | $10,000 | SD-1647 |
| 462 | 10/30/17 | Atty | $10,000 | SD-1648 |
| 145 | 11/28/17 | Atty | $7,500 | SD-1676 |
| | | | | |
| 170 | 1/3/18 | Atty | $10,000 | SD-1731 |
| 169 | 1/3/18 | Atty | $7,500 | SD-1732 |
| 492 | 12/7/17 | Koenig | $3,000 | SD-1752 |
| 509 | 1/30/18 | Atty | $7,500 | SD-1764 |
| 173 | 2/27/18 | Atty | $7,500 | SD-1797 |
| 552 | 2/28/18 | Atty | $4,000 | SD-1798 |
| 578 | 3/8/18 | Atty | $4,000 | SD-1815 |
| 581 | 3/15/18 | Koenig | $2,055 | SD-1832 |
| 596 | 3/27/18 | Atty | $7,500 | SD-1852 |
| 626 | 5/2/18 | Atty | $5,000 | SD-1889 |
| 635 | 5/8/18 | Koenig | $4,000 | SD-1900 |
| 627 | 5/18/18 | Atty | $5,000 | SD-1913 |
| 665 | 6/1/18 | Atty | $7,500 | SD-1939 |
| 672 | 6/13/18 | Atty | $3,500 | SD-1942 |
| 671 | 6/13/18 | Atty | $1,500 | SD-1943 |
| 708 | 6/22/18 | Koenig | $4,000 | SD-1974 |
| 709 | 7/2/18 | Atty | $7,500 | SD-1988 |
| 710 | 7/16/18 | Atty | $5,000 | SD-2010 |
| 753 | 7/31/18 | Atty | $7,500 | SD-2034 |
| 752 | 7/31/18 | Atty | $5,000 | SD-2051 |
| 800 | 9/7/18 | Atty | $7,500 | SD-2107 |
| 181 | 9/21/18 | Atty | $5,000 | SD-2122 |

| 833  | 10/3/18  | Atty   | $7,500  | SD-2146 |
|------|----------|--------|---------|---------|
| 853  | 12/18/18 | Atty   | $6,000  | SD-2173 |
| 861  | 11/2/18  | Koenig | $7,000  | SD-2190 |
| 874  | 11/13/18 | Atty   | $7,500  | SD-2193 |
| 939  | 1/25/19  | Atty   | $7,500  | SD-2294 |
| 958  | 2/22/19  | Atty   | $2,500  | SD-2322 |
| 992  | 3/28/19  | Atty   | $7,500  | SD-2359 |
| 980  | 3/26/19  | Atty   | $5,500  | SD-2360 |
| 1027 | 6/27/19  | Acc'nt | $25,000 | SD-2410 |
| 1044 | 7/15/19  | Atty   | $1,055  | SD-2440 |
| 1069 | 8/22/19  | Acc'nt | $660    | SD-2470 |
| 1074 | 8/30/19  | Atty   | $2,250  | SD-2490 |
| 1091 | 9/25/19  | Atty   | $12,500 | SD-2504 |
| 1093 | 10/16/19 | Atty   | $12,500 | SD-2512 |
| 2038 | 11/12/19 | Atty   | $7,500  | SD-2525 |
| 1112 | 12/9/19  | Atty   | $7,500  | SD-2545 |
| 1124 | 1/10/20  | Atty   | $7,500  | SD-2568 |
| 1135 | 2/5/20   | Atty   | $7,500  | SD-2586 |
| 1138 | 2/27/20  | Atty   | $4,000  | SD-2596 |
| 1142 | 3/11/20  | Atty   | $7,500  | SD-2607 |
| 1159 | 4/15/20  | Atty   | $7,500  | SD-2647 |
| 1173 | 5/15/20  | Atty   | $7,500  | SD-2663 |
| 1180 | 6/12/20  | Atty   | $7,500  | SD-2687 |
| 870  | 7/24/20  | Atty   | $7,500  | SD-2705 |

How can it be said with any confidence that the *entire* $529,000 was unauthorized under Directive 12? For instance, in the two months following the May 3, 2016 annuity withdrawal of $25,000 (for administrative fees), A 5730, five checks, between May 6th and August 1st, were written for attorney fees, totaling $17,500. SD 3334, 1133, 1142, 3345 and 3350. What about the two 2017 annuity fund

68

withdrawals totaling $110,000? SD 5730. The 2017 checks listed above for legal and auditing fees totaled over $140,000. As the government's own witness acknowledged the Directive 12 expense list included these *exact* types of expenses, A 836-838, how can the union members be owed that $110,000 in restitution?

Moreover, how, from this record can it be said that the January 7, 2018 withdrawal of $55,000 from the annuity fund for "Legal Fees" (*see*, SD 5730) was not being used, at least in part, for legal fees for January through March of 2018, which, as set out above, totaled over $30,000 spread out over five checks? Indeed, on the *exact date* of the January 3rd annuity fund withdrawal-related invoice (SD 5730), a check was written to counsel for $10,000. *See*, SD-1731. How can such a plain union expense amount be seriously considered as owed in restitution?

One last example: on September 4, 2019, $25,000 was withdrawn from the annuity fund for "[a]udit fees." A 5730. Then on September 25th and October 16th of 2019, two LEEBA checks were written for attorney fees, totaling $25,000. *See*, SD 2504 and SD 2512. Granted, the stated reason for the annuity withdraw doesn't match, but how can

69

we say with any confidence that these withdrawn annuity funds did
not go towards those legal fees?

### 3. *Ineffective assistance of counsel, clear error, plain error and an abuse of discretion*

The sheer volume of the above unaddressed records, all moved
into evidence by the government, which actually ***exceeds*** the ordered
restitution amount, cements the obvious absence of advocacy by both
trial and sentencing counsel. Despite being moved into evidence, few to
none of the above checks were referenced at all during trial. Though
the court accepted these documents into evidence at trial, there was no
indication in court, A 1936-1937, in its written order, A 1950-1951, or
in the judgment itself, A 1960-1962, of the District Court actually
considering any of the above evidentiary items or the Directive 12
expense parameters at all, in arriving at a proper restitution order.
The government and the Probation Office provided the District Court
the clearly erroneous $529,000 number, which simply totaled the
annuity fund transfers. *See*, A 1936; PSR § 137. Allowing this
restitution order to stand would seriously affect, and frankly negatively
impact, the integrity of the proceedings herein.

Without any litigation by trial or sentencing counsel in this regard, and without a specific monetary finding by the jury, the District Court accepted wholesale the number the government provided. The question, for restitution purposes, is not whether each filing requirement of Directive 12 was complied with. Rather, the District Court abused its discretion by not determining whether the proposed restitution amount *even approached* being accurate. A remand for a hearing should be ordered.

## Conclusion

With regards to **Point I**, this Court should: reverse the judgment of conviction and order a new trial. Alternatively, the matter should be remanded with instructions for the District Court to: *(a)* conduct a hearing regarding the ineffective assistance of counsel issues addressed in **Point I**, and *(b)* conduct a restitution hearing as addressed in **Point II**.

Dated:     July 23, 2024
              Buffalo, New York

                              Respectfully submitted,

                              **/s/ Timothy P. Murphy**
                              Timothy P. Murphy
                              Federal Public Defender's Office
                              Western District of New York
                              300 Pearl Street, Suite 200
                              Buffalo, New York 14202
                              Telephone: (716) 551-3341

## Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
_____

UNITED STATES OF AMERICA,                    **24-213-cr**

       Appellee,

    v.

STEVEN WHITTICK, AKA Sealed Defendant,
               Defendant,

KENNETH WYNDER, JR., AKA Sealed Defendant,
ANDREW BROWN,

       Defendants-Appellants.
_____

1.    This brief complies with the type-volume limitation of

Fed.R.App.P.32(a)(7)(B) because:

- ■    this brief contains 12,952 words, excluding the parts of the brief exempted by Fed.R. App.P. 32(a)(7)(B)(iii), *or*

- ☐    this brief uses a monospaced typeface and contains [*state the number of* ] lines of text, excluding the parts of the brief exempted by Fed.R.App.P.32(a) (7)(B)(iii).

2.    This brief complies with the typeface requirements of

Fed.R.App.P.32(a)(5)and the type style requirements of Fed.R. App.P.

32(a)(6)because:

- ■    this brief has been prepared in a proportionally spaced typeface using Century Schoolbook in size 14 font,

         *or*

- ☐    this brief has been prepared in a monospaced typeface using Microsoft Word 2013 with _____.

Dated:    July 23, 2024
          Buffalo, New York


              Respectfully submitted,


              **/s/ Timothy P. Murphy**
              Timothy P. Murphy
              Federal Public Defender's Office
              Western District of New York
              300 Pearl Street, Suite 200
              Buffalo, New York 14202
              Telephone: (716) 551-3341

74