# 24-213(L)

24-263(CON)

*To Be Argued By*:
Andrew Rohrbach

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket Nos. 24-213(L), 24-263(CON)

◆━◆◆◆━◆

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

KENNETH WYNDER, JR., also known as Sealed Defendant,
ANDREW BROWN,

*Defendants-Appellants,*

STEVEN WHITTICK, also known as Sealed Defendant,

*Defendant.*

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR THE UNITED STATES OF AMERICA

Damian Williams,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

Eli J. Mark,
Andrew Rohrbach,
Jacob R. Fiddelman,
*Assistant United States Attorneys,
Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . .  2

    A.  The Government's Case . . . . . . . . . . . . . . . .  2

        1.  LEEBA and the Annuity Fund . . . . . . .  4

        2.  The Fraudulent Withdrawals . . . . . . . .  5

        3.  Notice of Wrongdoing and Refusal to Comply with Audits . . . . . . . . . . . . . . . .  9

        4.  Lies to Union Members . . . . . . . . . . . .  10

        5.  Wynder's Tax Evasion . . . . . . . . . . . . .  11

    B.  The Defense Case . . . . . . . . . . . . . . . . . . . . .  11

    C.  The Verdict and Sentencings . . . . . . . . . . .  12

ARGUMENT:

POINT I—Sufficient Evidence Supported Brown's Convictions . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . .  12

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  14

POINT II—The District Court Correctly Denied Brown's Motion to Sever . . . . . . . . . . . . . . . . . . .  17

    A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . . .  18

    B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . .  19

ii

PAGE

      1.   Rule 8 Joinder . . . . . . . . . . . . . . . . . . . 19

      2.   Rule 14 Severance . . . . . . . . . . . . . . . 20

  C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . 21

      1.   Joinder Was Proper Under Rule 8 . . . 21

      2.   Any Misjoinder Was Harmless . . . . . . 25

      3.   Judge Castel Did Not Abuse His
          Discretion in Denying Rule 14
          Severance . . . . . . . . . . . . . . . . . . . . . . . 29

POINT III—The District Court Did Not Abuse Its
Discretion in Crafting a Remedy for the
Government's Discovery Errors . . . . . . . . . . . 30

  A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . 30

  B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . 31

  C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . 32

POINT IV—There Was No Plain Error in the
Government's Summation . . . . . . . . . . . . . . . . 34

  A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . 34

  B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . 36

POINT V—The District Court Did Not Plainly Err in
Calculating Wynder's Restitution Obligation . 40

  A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . 40

iii

PAGE

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 41

POINT VI—Wynder Did Not Receive Ineffective
Assistance of Counsel . . . . . . . . . . . . . . . . . . . . 44

A. Relevant Facts . . . . . . . . . . . . . . . . . . . . . . 44

B. Applicable Law . . . . . . . . . . . . . . . . . . . . . 47

1. Ineffective Assistance of Counsel . . . . 47

2. Ineffective Assistance Claims on Direct
Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . 49

C. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 51

1. This Court's Precedent Forecloses
Finding *Per Se* Ineffective Assistance
Here . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

2. Wynder Has Failed to Identify
Objectively Deficient Performance by His
Trial Counsel . . . . . . . . . . . . . . . . . . . . 53

3. Wynder Does Not Even Attempt to
Explain How the Alleged Ineffective
Performance Caused Him Prejudice. . 57

4. Alternatively, Wynder's Ineffective
Assistance Claim Should Be Deferred to
a Section 2255 Motion . . . . . . . . . . . . . 58

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

iv

# TABLE OF AUTHORITIES

*Cases*:

*Bellamy v. Cogdell*,
 974 F.2d 302 (2d Cir. 1992) . . . . . . . . . . . . . 51, 52

*Bennett v. United States*,
 663 F.3d 71 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 47

*Bloomer v. United States*,
 162 F.3d 187 (2d Cir. 1998) . . . . . . . . . . . . . . . 51

*Chin v. Port Auth. of N.Y. & N.J.*,
 685 F.3d 135 (2d Cir. 2012) . . . . . . . . . . . . . . . 33

*Cox v. Donnelly*,
 387 F.3d 193 (2d Cir. 2004) . . . . . . . . . . . . . . . 51

*Dunham v. Travis*,
 313 F.3d 724 (2d Cir. 2002) . . . . . . . . . . . . . . . 54

*Garner v. Lee*,
 908 F.3d 845 (2d Cir. 2018) . . . . . . . . . . . . . . . 57

*Gilead Cmty. Servs. v. Town of Cromwell*,
 112 F.4th 93 (2d Cir. 2024) . . . . . . . . . . . . . . . 52

*Harrington v. Richter*,
 562 U.S. 86 (2011). . . . . . . . . . . . . . . . . . . . . 49, 57

*Janus v. AFSCME, Council 31*,
 585 U.S. 878 (2018). . . . . . . . . . . . . . . . . . . . . . . 8

*Massaro v. United States*,
 538 U.S. 500 (2003). . . . . . . . . . . . . . . . 49, 50, 58

v

PAGE

*McBride v. BIC Consumer Prods. Mfg. Co.,*
583 F.3d 92 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . 58

*Puckett v. United States,*
556 U.S. 129 (2009). . . . . . . . . . . . . . . . . . . . . . . . 36

*Samet v. United States,*
559 F. App'x 47 (2d Cir. 2014) . . . . . . . . . . . . . . 52

*Sparman v. Edwards,*
154 F.3d 51 (2d Cir. 1998) . . . . . . . . . . . . . . 50, 58

*Strickland v. Washington,*
466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . *passim*

*Tippins v. Walker,*
77 F.3d 682 (2d Cir. 1996) . . . . . . . . . . . . . . 48, 51

*United States v. Aguirre,*
912 F.2d 555 (2d Cir. 1990) . . . . . . . . . . . . . . . . 47

*United States v. Atilla,*
966 F.3d 118 (2d Cir. 2020) . . . . . . . . . . . . . . . . 13

*United States v. Attanasio,*
870 F.2d 809 (2d Cir. 1989) . . . . . . . . . . . . . 19, 22

*United States v. Avenatti,*
81 F.4th 171 (2d Cir. 2023) . . . . . . . . . . . . . . . . 13

*United States v. Baker,*
899 F.3d 123 (2d Cir. 2018) . . . . . . . . . . . . . . . . 12

*United States v. Banki,*
685 F.3d 99 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 34

*United States v. Blakney,*
941 F.2d 114 (2d Cir. 1991) . . . . . . . . . . . . . . . . 21

vi

PAGE

*United States v. Bonventre,*
   646 F. App'x 73 (2d Cir. 2016) . . . . . . . . . . . *passim*

*United States v. Burns,*
   104 F.3d 529 (2d Cir. 1997) . . . . . . . . . . . . . . 35, 39

*United States v. Capers,*
   20 F.4th 105 (2d Cir. 2021) . . . . . . . . . . . . . . 13, 16

*United States v. Connolly,*
   24 F.4th 821 (2d Cir. 2022) . . . . . . . . . . . . . . 16, 17

*United States v. Cronic,*
   466 U.S. 648 (1984). . . . . . . . . . . . . . . . . . . . . 48, 55

*United States v. De La Pava,*
   268 F.3d 157 (2d Cir. 2001) . . . . . . . . . . . . . . . 50

*United States v. Doe,*
   365 F.3d 150 (2d Cir. 2004) . . . . . . . . . . . . . . . 59

*United States v. Espinal,*
   981 F.2d 664 (2d Cir. 1992) . . . . . . . . . . . . . . 35, 38

*United States v. Eyman,*
   313 F.3d 741 (2d Cir. 2002) . . . . . . . . . . . . . . . 52

*United States v. Facen,*
   812 F.3d 280 (2d Cir. 2016) . . . . . . . . . . . . . . . 13

*United States v. Farhane,*
   634 F.3d 127 (2d Cir. 2011) . . . . . . . . . . . . . . 35, 38

*United States v. Feyrer,*
   333 F.3d 110 (2d Cir. 2003) . . . . . . . . . . . . . . 19, 20

*United States v. Fleurimont,*
   401 F. App'x 580 (2d Cir. 2010) . . . . . . . . . . . . . 50

vii

PAGE

*United States v. Gaskin*,
364 F.3d 438 (2d Cir. 2004) . . . . . . . . . . . . . 47, 50

*United States v. Grunberger*,
431 F.2d 1062 (2d Cir. 1970) . . . . . . . . . . . . . . . 37

*United States v. Gushlak*,
728 F.3d 184 (2d Cir. 2013) . . . . . . . . . . . . . . . . 41

*United States v. Ismail*,
219 F.3d 76 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 41

*United States v. Jackson*,
335 F.3d 170 (2d Cir. 2003) . . . . . . . . . . . . . . . . 14

*United States v. Kaid*,
502 F.3d 43 (2d Cir. 2007) . . . . . . . . . . . . . . . 51, 52

*United States v. Khedr*,
343 F.3d 96 (2d Cir. 2003) . . . . . . . . . . . 49, 50, 59

*United States v. Lane*,
474 U.S. 438 (1986) . . . . . . . . . . . . . . . . 26, 27, 28

*United States v. Lech*,
161 F.R.D. 255 (S.D.N.Y. 1995) . . . . . . . . . . . . . 24

*United States v. Little*,
828 F. App'x 34 (2d Cir. 2020) . . . . . . . . . . . . . . 21

*United States v. Litwok*,
678 F.3d 208 (2d Cir. 2012) . . . . . . . . . . 20, 25, 26

*United States v. Mapp*,
170 F.3d 328 (2d Cir. 1999) . . . . . . . . . . . . . . 35, 39

*United States v. Marcus*,
560 U.S. 258 (2010) . . . . . . . . . . . . . . . . . . . . *passim*

viii

PAGE

*United States v. Marshall,*
    132 F.3d 63 (D.C. Cir. 1998). . . . . . . . . . . . . 31, 33

*United States v. Miller,*
    116 F.3d 641 (2d Cir. 1997) . . . . . . . . . . . . . . . 32

*United States v. Milstein,*
    481 F.3d 132 (2d Cir. 2007) . . . . . . . . . . . . . . . 41

*United States v. Monsanto Lopez,*
    798 F. App'x 688 (2d Cir. 2020) . . . . . . . . . . . . . 33

*United States v. Morris,*
    350 F.3d 32 (2d Cir. 2003) . . . . . . . . . . . . . . . . 49

*United States v. Pearson,*
    570 F.3d 480 (2d Cir. 2009) . . . . . . . . . . . . . . . 41

*United States v. Pena,*
    793 F.2d 486 (2d Cir. 1986) . . . . . . . . . . . . . 35, 38

*United States v. Perez,*
    144 F.3d 204 (2d Cir. 1998) . . . . . . . . . . . . . . . 35

*United States v. Persico,*
    645 F.3d 85 (2d Cir. 2011) . . . . . . . . . . . . . . 13, 16

*United States v. Qurashi,*
    634 F.3d 699 (2d Cir. 2011) . . . . . . . . . . . . . . . 40

*United States v. Raniere,*
    55 F.4th 354 (2d Cir. 2022) . . . . . . . . . . . . . . 13, 16

*United States v. Rittweger,*
    524 F.3d 171 (2d Cir. 2008) . . . . . . . 19, 20, 23, 25

*United States v. Rivernider,*
    828 F.3d 91 (2d Cir. 2016) . . . . . . . . . . . . . . . . 40

ix

PAGE

*United States v. Rutigliano,*
    790 F.3d 389 (2d Cir. 2015) . . . . . . . . . . . . . . . . . 13

*United States v. Sanchez,*
    912 F.2d 18 (2d Cir. 1990) . . . . . . . . . . . . . . 32, 33

*United States v. Shellef,*
    507 F.3d 82 (2d Cir. 2007) . . . . . . . . . . . . . . 24, 28

*United States v. Snype,*
    441 F.3d 119 (2d Cir. 2006) . . . . . . . . . . . . . . . . 27

*United States v. Spinelli,*
    352 F.3d 48 (2d Cir. 2003) . . . . . . . . . . . 20, 21, 29

*United States v. Turoff,*
    853 F.2d 1037 (2d Cir. 1988) . . . . . . . . . 21, 22, 28

*United States v. Villafuerte,*
    502 F.3d 204 (2d Cir. 2007) . . . . . . . . . . . . . . . . 36

*United States v. Young,*
    470 U.S. 1 (1985). . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Zackson,*
    12 F.3d 1178 (2d Cir. 1993) . . . . . . . . . . . . . 34, 38

*United States v. Zangari,*
    677 F.3d 86 (2d Cir. 2012) . . . . . . . . . . . . . . . . . 41

*United States v. Zichettello,*
    208 F.3d 72 (2d Cir. 2000) . . . . . . . . . . . . . . 35, 37

*Statutes, Rules & Other Authorities*:

18 U.S.C. § 3663A(a)(1) . . . . . . . . . . . . . . . . . . . . . . . 40

x

PAGE

18 U.S.C. § 3664(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

18 U.S.C. § 3664(f)(1)(A) . . . . . . . . . . . . . . . . . . . . . . 40

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . 44, 49, 50, 58, 59

Fed. R. Crim. P. 8 . . . . . . . . . . . . . . . . . . 17, 19, 20, 21

Fed. R. Crim. P. 14 . . . . . . . . . . . . . . . . . . . . 17, 20, 29

Fed. R. Crim. P. 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Fed. R. Crim. P. 52(b) . . . . . . . . . . . . . . . . . . . . . 37, 41

Fed. R. Evid. 404(b) . . . . . . . . . . . . . . . . . . . . . . . . . 28

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
## Docket Nos. 24-213(L), 24-263(Con)

———————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

KENNETH WYNDER, JR., also known as Sealed
Defendant, ANDREW BROWN,

*Defendants-Appellants,*

STEVEN WHITTICK, also known as Sealed Defendant,

*Defendant.*

———————

## BRIEF FOR THE UNITED STATES OF AMERICA

———————

### Preliminary Statement

Kenneth Wynder, Jr., and Andrew Brown appeal from judgments of conviction entered on January 19, 2024, and amended as to Brown on January 24, 2024, in the United States District Court for the Southern District of New York, following a one-week jury trial before the Honorable P. Kevin Castel, United States District Judge.

2

Superseding Indictment S1 20 Cr. 470 (PKC) (the "Indictment") was filed on July 21, 2021, in seven counts. Count One charged Brown and Wynder with conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349. Count Two charged both defendants with wire fraud, in violation of 18 U.S.C. § 1343. Count Three charged Wynder with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. Counts Four through Seven charged Wynder with tax evasion, in violation of 26 U.S.C. § 7201.

Trial commenced on May 22, 2023, and ended on May 30, 2023, when the jury returned a verdict of guilty on all counts.

On January 17, 2024, Judge Castel sentenced Wynder to 40 months' imprisonment, to be followed by three years' supervised release, and imposed a $700 mandatory special assessment, $529,000 in forfeiture, and $838,683.62 in restitution. That same day, Judge Castel sentenced Brown to 18 months' imprisonment, to be followed by three years' supervised release, and imposed a $200 mandatory special assessment, $3,049.08 in forfeiture, and $529,000 in restitution.

On May 7, 2024, this Court denied Brown and Wynder's respective motions for bail pending appeal.

Brown and Wynder are serving their sentences.

## Statement of Facts

### A. The Government's Case

At trial, the Government presented overwhelming evidence that the defendants—Wynder, the former

3

president of a labor union that represented City of New York (the "City") law enforcement personnel, and Brown, the union's former financial advisor—together engaged in a fraudulent scheme to raid the retirement accounts of union members to pay for routine union expenses and other purposes, and that Wynder evaded paying taxes on money obtained from the union.

This evidence included, among other things, records of the fraudulent withdrawals made by Wynder and Brown; testimony from a trustee of the retirement fund that Wynder and Brown's withdrawals were made without a valid purpose and without the trustees' knowledge; testimony from auditors about Wynder and Brown's resistance to being audited and warnings to Wynder that he was mishandling retirement funds in violation of the union's agreements with the City; testimony from union members describing false statements made to them about the reasons for withdrawals from their accounts; text messages between Wynder and Brown about how to misleadingly describe the withdrawals to retirement fund personnel; and a recording of Wynder making false statements to prospective union members about the reasons for the fraudulent withdrawals. Evidence regarding Wynder's tax evasion included testimony about Wynder's income, which Wynder deliberately paid to himself through channels other than the union's payroll process; the resulting underreporting of Wynder's income to the IRS; and Wynder's failure to file tax returns.

4

### 1. LEEBA and the Annuity Fund

The Law Enforcement Employees Benevolent Association ("LEEBA") is a labor union that represents law enforcement personnel at various City agencies. (Tr. 41-44, 191-92).[1] Employees of certain agencies represented by LEEBA could participate in an annuity-based retirement fund comprised of individual retirement accounts held by an independent third-party custodian (the "Annuity Fund"). (Tr. 45-46, 192-93, 397). The City made direct contributions to the Annuity Fund, which then disbursed the funds into the individual members' accounts held by third-party custodian Ascensus, a financial services firm. (Tr. 46, 193, 397).

Wynder was the President of LEEBA and a trustee of the Annuity Fund. (Tr. 42-44, 272, 336-37). Brown was an experienced financial professional who operated his own financial services firm. (Tr. 143, 170-71; GX 1402). Brown and his firm served as LEEBA's benefits coordinator and the primary investment-advisor representative for the Annuity Fund. (Tr. 86, 228; GX 311). Brown also brokered insurance benefits for LEEBA, including a life insurance plan. (Tr. 298-99,

---

[1]    "Tr." refers to the trial transcript; "GX" refers to a Government exhibit admitted at trial; "B-Br." and "W-Br." refer to Brown and Wynder's briefs on appeal; "B-A." and "W-A." refer to the appendices filed with those briefs; and "Dkt." refers to an entry on the District Court's docket for this case. Unless otherwise noted, all quotations omit all internal quotations marks, citations, and alterations.

5

303-04). These benefits were supposed to be paid for by a separate fund (the "Welfare Fund"), which provided various non-retirement benefits for union members. (Tr. 58, 397). For his work on behalf of LEEBA and its funds, Brown earned commissions on the money in the Annuity Fund and on insurance payments he brokered for the Welfare Fund, including LEEBA's life insurance premium payments. (Tr. 86-87, 136, 147, 172, 303-04).

Wynder and Brown both served as fiduciary "plan administrators" for the Annuity Fund. (Tr. 78, 116, 340; GX 444). The two also socialized and were good friends. (*See, e.g.*, Tr. 144; GX 1331).

LEEBA was permitted to withdraw money from the Annuity Fund only to pay expenses associated with administering the Annuity Fund itself, not the union. (Tr. 112-13, 202-03, 285-86, 336-38; GX 212, 707, 730, 746). LEEBA paid other companies to administer the Annuity Fund. (Tr. 104, 360-61, 428, 617; GX 707). Annuity Fund recordkeeping and administration was performed by Ascensus, the third-party administrator and custodian. (Tr. 76-77, 104, 347, 351). Ascensus charged between $3,500 and $16,000 annually to administer the Annuity Fund. (Tr. 135; GX 2208 at 8). Any undocumented administrative expenses that LEEBA may have incurred for the benefit of the Annuity Fund would have been "minimal." (Tr. 347).

## 2. The Fraudulent Withdrawals

To withdraw money from the Annuity Fund, Wynder or Brown had to complete a "Special Authorization Fee Form" and submit it to Ascensus. (Tr. 112-

6

14). The form stated that withdrawals were permitted only to pay fees to administer the Annuity Fund; included a certification that the authorizing administrator had "considered the plan document provisions, rules and regulations regarding plan expenses"; and required identifying the purpose of the withdrawal and attachment of an invoice substantiating that purpose. (Tr. 115-18; GX 427, 432).

Between 2012 and 2019, Wynder and Brown made 17 withdrawals from the Annuity Fund to LEEBA's operating accounts totaling $529,000, without board authorization and without having incurred any actual expenses in administering the Annuity Fund. (*See* Tr. 435-36; GX 2208 at 1; GX 418-434). For each withdrawal, Wynder and Brown submitted a form to Ascensus filled out by Brown or at his direction. (Tr. 150-51, 155, 159, 174-78). Acting on Brown's instructions, Brown's staff generated invoices on LEEBA letterhead reflecting purported expenses incurred by LEEBA in administering the Annuity Fund, many of which were characterized as administrative fees or audit expenses. (Tr. 117, 151-52, 174). Wynder would sign the form and return it to Brown, and Brown or his staff would submit the completed form and invoice to Ascensus. (Tr. 147-48).

Wynder and Brown's representations on the forms about the purpose of the withdrawals and the attached invoices were deliberately false. For example, Brown initiated a withdrawal of $40,000 in May 2019 that was purportedly for "Administrative Management/ Cost" but was, in fact, used for non-Annuity Fund expenses including overdue life insurance premium

7

payments that Brown wanted LEEBA to pay. (GX 432, 906, 2101, 2209, 1306-B-6). Brown received commissions on these insurance premiums and pushed Wynder and the LEEBA office manager to pay the premiums using money withdrawn from the Annuity Fund to avoid harming his business relationship with the insurance provider—even though the insurance had nothing to do with the administration of the Annuity Fund. (*See* GX 2101 (Brown: "I do a LOT of business with [the life insurance company] and I gave my word that this would be paid"); GX 2102 (Brown explaining to LEEBA's office manager that he needed these bills paid because he was "concerned" that otherwise he could "no longer do business with [the insurance company]"); GX 2209 (summary of relevant communications and withdrawals). Brown had initially suggested using the false explanation that the funds were needed for an "audit" but later changed the approach to label it an "administrative" expense. (*Compare* GX 1306-B-6 (Brown texting Wynder: "Let me know if you want more. I'll write 'audit' as the reason."), *with* GX 432 (listing "administrative" expenses as justification)). Relying on the false withdrawal form and invoice, Ascensus distributed the requested $40,000 to LEEBA, and soon after, LEEBA made a bulk payment to the insurance company for its delinquent insurance premium payments, leaving some money left over. (GX 908, 909; 2209).

Brown also sometimes modified the false justifications Wynder proposed to increase the likelihood that Ascensus would approve the withdrawals. For example, in October 2018, Wynder sent a text message to Brown asking to do another withdrawal, saying "i need

8

this drew." (GX 1306-B-2). Brown responded, "you need to let me know how much and what we need to write for a purpose." (GX 1306-B-2). Wynder replied, "60000 and janus decision and make it for 2019 early withdrawal"—a reference to *Janus v. AFSCME, Council 31*, 585 U.S. 878 (2018), a Supreme Court decision regarding union opt-out rights that had no impact on bargained-for benefits like the Annuity Fund. (GX 1306-B-2; Tr. 56-58, 425). Rather than follow those instructions, Brown instead listed "Administrative Management/Cost" on the withdrawal form and supporting invoice. (GX 429).

Wynder and Brown's numerous representations that withdrawals were for "administrative" or "audit" expenses were lies. (GX 2208 at 1). The withdrawals dwarfed Ascensus' fees for actually administering the Annuity Fund, (*see id.* at 8), and LEEBA did not itself do any work to administer the fund, (*see, e.g.*, Tr. 47, 179, 428). And the so-called audit-related withdrawals far exceeded the actual payments made to an accounting firm for Annuity Fund-related work. (*Compare* GX 2208 at 1 (chart showing withdrawals purportedly to pay auditors)*, with* GX 745 (account statement showing payments to auditor). Rather, Wynder and Brown frequently made the fraudulent withdrawals from the Annuity Fund when the union's bank accounts were running low on operating funds. (*See* GX 2008 at 2-7).

Wynder and Brown's fraudulent withdrawals from the Annuity Fund caused meaningful losses to LEEBA members' individual retirement accounts. (*See, e.g.*, GX 1001 at 17-18 (example individual quarterly

9

statement reflecting that $55,000 in withdrawals by Wynder and Brown that quarter resulted in $353.34 fee to individual plan participant); *see* GX 1003, 1008).

### 3. Notice of Wrongdoing and Refusal to Comply with Audits

The union retained an outside accounting firm to prepare required financial statements and annual reports. (Tr. 210, 332; GX 707). The accountants identified Wynder and Brown's improper withdrawals, explained that withdrawals from the Annuity Fund could not be used to pay routine union expenses, and instructed LEEBA to stop making such withdrawals and to repay the money, which Wynder promised to do. (Tr. 360-65; GX 707, 730). Nevertheless, Wynder and Brown continued the fraudulent withdrawals unabated and in even larger amounts. (GX 2208 at 1). The auditor also concluded that Brown "wasn't consistent in his responses" to their inquiries and was slow to supply information to them, thus impeding the audit. (Tr. 342, 348).

The Annuity Fund was also audited by the City, which risked public exposure of Wynder and Brown's fraud. But the City audit was substantially impeded by LEEBA's lack of cooperation and its failure to submit required City filings. (*See* GX 236). At one point, Wynder and Brown participated in a meeting with the City auditors at which the auditors explained how the union was out of compliance with city regulations. (Tr. 228-29). During the meeting, Wynder was evasive in responding to the auditors' questions. (*Id.*). As a result of Wynder and LEEBA's refusal to cooperate with

10

the audit, the City placed new Annuity Fund and Welfare Fund contributions into escrow. (Tr. 243, 562).

### 4. Lies to Union Members

The perceived financial security of the Annuity Fund was a central selling point for LEEBA in recruiting new members. (GX 1401, 2003). LEEBA officers handed out copies of a sample Annuity Fund quarterly statement that Brown provided to recruit new members. (Tr. 430-34; GX 2005). Brown helped recruitment by speaking to potential members "about the benefits of having LEEBA annuity fund and welfare benefits fund, as opposed to another union." (Tr. 432).

When Wynder and Brown were questioned by union members and prospective members about the high fees in the Annuity Fund—the result of Wynder and Brown's fraudulent withdrawals—they both lied about those transactions. For example, in August 2019, Wynder told a union member that the money was taken out because "we needed some money for some legal fees, and you will be getting your money back." (Tr. 406). Brown told another union member that the money was a loan "[t]o fight the City of New York in upcoming legal battles." (Tr. 625). A third LEEBA member asked Wynder about "a rumor confirmed by drew brown that money is being tak[en] out of our [annuity] to fight a legal battle with the city." (GX 1308). Contrary to these claims, no lawsuits were ever filed on behalf of the Annuity Fund, (*cf.* Tr. 434-35), and there was no evidence that the withdrawn money was ever repaid, (*cf.* Tr. 365). Wynder never told this purported purpose to Ascensus, which would not have

11

processed such a withdrawal because it would not have been permissible. (Tr. 120). Brown later denied giving that implausible explanation when confronted by a LEEBA officer and trustee of the Annuity Fund, claiming instead that it was possible the money was being used for an audit and that the withdrawals had been approved by LEEBA's treasurer. (GX 152).

### 5. Wynder's Tax Evasion

Wynder worked with LEEBA's treasurer to pay himself outside of the payroll system, including through cash, checks, and direct payments for personal expenditures including a Lexus automobile. (*See, e.g.*, GX 2201-2207). For example, on two occasions, LEEBA's treasurer withdrew $16,000 in cash from LEEBA's operating account and then deposited $15,000 in cash into Wynder's personal bank account. (Tr. 534-35). Wynder's bypassing of the payroll system resulted in the systematic underreporting of Wynder's income to the IRS. (Tr. 505-06; GX 2201). When Wynder and the treasurer's attempts to further reduce their tax burden by adjusting their withholdings failed (Tr. 486-87, 501-02; GX 1504 at 3), Wynder directed even more of his salary to bypass the payroll provider, by 2019 ultimately redirecting essentially all of his more than $110,000 annual income. (GX 2201).

### B. The Defense Case

In addition to cross-examining many of the Government's witnesses, Wynder offered a stipulation and multiple summary charts reflecting other legitimate transactions in LEEBA's bank accounts. (*See* Tr. 631-

12

32). Brown also cross-examined the Government's witnesses but did not otherwise present a defense case.

## C.  The Verdict and Sentencings

On May 30, 2023, the jury returned a verdict of guilty on all counts. (B-A. 14).

On January 17, 2024, Judge Castel sentenced Wynder principally to 40 months' imprisonment and Brown principally to 18 months' imprisonment. (W-A. 1954-62; B-A 782-788). In relevant part, Judge Castel also ordered both defendants to pay restitution of $529,000 to the Annuity Fund, jointly and severally— the total amount of their fraudulent withdrawals. (W-A. 1950-53).

## A R G U M E N T

### POINT I

### Sufficient Evidence Supported Brown's Convictions

Brown contends that the trial evidence was insufficient to permit the jury's finding of fraudulent intent. (B-Br. 33-43). The argument is without merit.

## A.  Applicable Law

Although this Court will "review sufficiency of evidence challenges *de novo* . . . defendants face a heavy burden, as the standard of review is exceedingly deferential" to the jury's verdict. *United States v. Baker*, 899 F.3d 123, 129 (2d Cir. 2018). A jury verdict must be

13

upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011) (emphasis in original). A court "may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Capers*, 20 F.4th 105, 113 (2d Cir. 2021).

This Court views the evidence in the light most favorable to the Government, *United States v. Atilla*, 966 F.3d 118, 128 (2d Cir. 2020), analyzes the evidence "in conjunction, not in isolation," *Persico*, 645 F.3d at 104, as "to the totality of the government's case and not to each element, as each fact may gain color from others," *United States v. Avenatti*, 81 F.4th 171, 184 (2d Cir. 2023). This Court must "credit every inference that the jury might have drawn in favor of the government, because the task of choosing among competing, permissible inferences is for the jury." *United States v. Raniere*, 55 F.4th 354, 364 (2d Cir. 2022). Because the jury is entitled to choose which inferences to draw, "the government's case need not exclude every possible hypothesis of innocence." *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016).

"These standards apply whether the evidence being reviewed is direct or circumstantial." *Persico*, 645 F.3d at 105. "A jury's verdict may be based entirely on circumstantial evidence." *United States v. Rutigliano*, 790 F.3d 389, 402 (2d Cir. 2015). Deference to the jury's verdict on conspiracy counts is "especially important" because "a conspiracy by its very nature is a

14

secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003).

## B. Discussion

Ample evidence supported the jury's conclusion that Brown was fully aware of the fraudulent nature of the representations he was making to Ascensus to induce the withdrawals from the Annuity Fund.

First, Brown played a central role in preparing the fraudulent withdrawal requests and fictitious invoices. (*See, e.g.*, Tr. 147-62, 171-78). Brown's responsibility for creation of these vague and repetitive invoices when he knew the Annuity Fund was in fact administered by an outside vendor was highly inculpatory support for the jury's conclusion that Brown knew of the fraudulent nature of the paperwork he prepared.

Second, a reasonable jury could easily conclude that Brown's text messages demonstrated his knowledge that the true purpose of particular withdrawals was different from what he stated on the withdrawal forms and invoices. (*See* GX 429, 432, 2209). For example, in May 2019, Brown requested that Wynder authorize a withdrawal to "resolve[ ] the problem" of the union's overdue life insurance premiums, which were unrelated to the Annuity Fund and which would not have been accepted as a stated basis for a withdrawal. (Tr. 45, 120, 397, 574). As described above, Brown first suggested that he could "write 'audit' as [the] reason" but later listed "administrative management," (Tr. 574; GX-432), and the withdrawn

15

money was then used to pay LEEBA's delinquent insurance bill. (Tr. 575, GX 908-09). Similarly, in October 2018, after Wynder requested a $60,000 withdrawal and explained that an employee should list the Supreme Court's recent "janus decision" as the purpose—another proposed reason that would not have been approved because it was unrelated to the operation of the Annuity Fund—Brown completed the withdrawal form but listed "administrative management/cost" as the purpose. (Tr. 563).

Third, a reasonable jury could have concluded that Brown deliberately lied about the withdrawals when confronted by union members. As detailed above, Brown told a union member that the withdrawals were a loan "[t]o fight the City of New York in upcoming legal battles," (Tr. 625; *see* Tr. 402)—which was neither the true purpose of the withdrawals nor even the fraudulent purposes Brown had repeatedly listed on the withdrawal forms.

Fourth, the evidence supported the reasonable inference that Brown knew the Annuity Fund was not in compliance with City regulations (Tr. 390), and that by 2019 the City was withholding contributions in escrow and the union was failing to pay its bills (GX 527). Brown participated in a meeting with the City's auditors in which these matters were explained and in response to which Wynder was highly evasive. (Tr. 228-29). Moreover, the Annuity Fund's outside accountant had trouble getting necessary documents from Brown. (Tr. 341-42, 348).

Fifth, Brown had a strong financial motive to deliberately raid the Annuity Fund in order to permit

16

LEEBA to pay its non-Annuity-Fund bills, because LEEBA was an important long-term client of his, and he earned commissions on some of the expenses the raided funds were used to pay. (Tr. 147, 298, 314, 326).

Crediting all inferences in favor of the Government, *Raniere*, 55 F.4th at 364, the District Court correctly denied Brown's post-trial motions because "[a] reasonable jury could conclude that Brown purposefully and with the intent to deceive made a false statement on the special authorization forms to access the money in the annuity fund, and he twice withdrew money from the annuity fund knowing his withdrawals were fraudulent." (B-A. 761).

Brown's arguments to the contrary are unpersuasive, as they require this Court to ignore the evidence or to intrude on the jury's exclusive role in selecting from among competing inferences. *See Persico*, 645 F.3d at 104; *Raniere*, 55 F.4th at 364. Brown claims, for example, that the record evidence supports the alternative conclusion that he was unaware of the auditors' warnings; that he was unaware of certain City regulations; that he believed Wynder's representations that the withdrawals were permissible; and that he did not have a motive to commit the fraud. (B-Br. 35-36, 39, 41). But the jury clearly rejected those conclusions. This is not a case in which "the evidence that the defendant committed the crime alleges is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Capers*, 20 F.4th at 113.

*United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022), on which Brown relies, is readily

17

distinguishable. In *Connolly*, the defendants submitted information to the London Interbank Offered Rate panel. *See id.* at 834-35. This Court held that, notwithstanding testimony from cooperating witnesses that the process used to formulate the rate information provided was "intuitively wrong" without any other evidence that the submissions were false or inaccurate, the government had failed to establish the "statements were false, half-truths, or fraudulent omissions." *Id*. In this case, by contrast, the jury was presented with substantial evidence that the reasons Brown stated on certain withdrawal forms were false and that Brown knew that. As described above, in several instances the reasons Brown listed did not match the reasons Wynder had told him to list. Similarly, Brown prepared numerous invoices for "audit" or "legal" fees that, if genuine, would have been supported by actual third-party invoices, rather than the fabricated LEEBA invoices Brown created. Ample evidence supported the jury's conclusion that Brown knew he was listing false reasons for withdrawals that were not for authorized expenses.

## POINT II

### The District Court Correctly Denied Brown's Motion to Sever

Brown argues that the District Court erred in denying his motion to sever Wynder's tax-fraud counts from their joint trial, asserting misjoinder and spillover prejudice under Fed. R. Crim. P. 8 and 14. (B-Br. 43-56). Neither claim has merit; the Indictment properly joined the challenged counts, and Judge Castel did not

18

abuse his discretion in concluding that Brown would suffer no undue prejudice from a joint trial.

## A. Relevant Facts

The Indictment alleged that Brown and Wynder's fraud scheme involved withdrawing funds from the Annuity Fund under false pretenses for purposes including "to enrich WYNDER . . . including through unauthorized and excessive checks to WYNDER and cash withdrawals to WYNDER's benefit" (B-A. 40-41)—in other words, the payments at issue in the tax evasion scheme. Without the Annuity Fund scheme, the Indictment alleged, LEEBA's "operating account would have been insolvent," and Wynder's tax scheme would not have been possible, because LEEBA would have been unable to pay Wynder the income he avoided reporting. (B-A. 41-42). As part of Wynder's tax conspiracy, the Indictment continued, Wynder "schemed to fraudulently conceal from the IRS payments . . . obtained from LEEBA, including money obtained in cash and checks." (B-A. 48-49).

In advance of trial, Brown moved to sever, arguing that the wire fraud and tax fraud conspiracies were not part of the same series of acts or transactions to permit joinder, and alternatively that discretionary severance was warranted to avoid spillover prejudice. (B-A. 56-73).

On February 15, 2022, Judge Castel denied the motion, concluding that Wynder's failure to report "funds that were derived from the [wire fraud] conspiracy was a continuation of the course of conduct," and "it was certainly a foreseeable consequence [to Brown] of the

19

conspiratorial conduct" that Wynder would not report his embezzlement to the IRS. (B-A. 123-124.1). Judge Castel also concluded that "the tax counts do not introduce something inflammatory into this case," and that he would "charge the jury, in no uncertain terms, that guilt or lack of guilt is an individual issue for each defendant, and that Mr. Brown is not charged in these counts, and the conduct of a codefendant with regard to a count which he is not charged with cannot be considered against him." (B-A. 124-124.1). Judge Castel invited Brown's counsel to propose an appropriately "strong limiting instruction" for use at trial. (*Id.*).

## B.  Applicable Law

### 1.  Rule 8 Joinder

Joinder of multiple defendants and multiple offenses are joined in the same indictment, is governed by Rule 8(b), which permits joinder where defendants "have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." The propriety of joinder turns on what is "alleged" in the "indictment." *United States v. Rittweger*, 524 F.3d 171, 178 (2d Cir. 2008).

Rule 8(b) does not require that co-defendants participated in the same conspiracy or be chargeable in an overarching conspiracy count; instead, it requires only that the charged offenses "be unified by some substantial identity of facts or participants, or arise out of a common plan or scheme." *United States v. Attanasio*, 870 F.2d 809, 815 (2d Cir. 1989); *see Rittweger*, 524 F.3d at 177 (affirming joinder of separate conspiracies involving overlapping defendants); *United States v.*

20

*Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003) (upholding joinder of codefendants in separate respective conspiracies). Courts "apply a commonsense rule to decide whether, in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice to either or both of the defendants resulting from the joinder." *Rittweger*, 524 F.3d at 177; *see Feyrer*, 333 F.3d at 114 ("[A] reasonable person would easily recognize the common factual elements that permit joinder.").

"[T]ax counts can properly be joined with non-tax counts where the revenue at issue arose directly from the latter crimes, or when one scheme stemmed from the other, such that proof of one is indispensable for a full understanding of the other." *United States v. Bonventre*, 646 F. App'x 73, 90 (2d Cir. 2016).

This Court reviews the propriety of Rule 8 joinder *de novo*. *United States v. Litwok*, 678 F.3d 208, 217 (2d Cir. 2012). "Erroneous joinder requires reversal only if the misjoinder result[ed] in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict." *Id.*

## 2. Rule 14 Severance

Under Rule 14(a), "[i]f the joinder of offenses or defendants in an indictment ... appears to prejudice a defendant ..., the court may order" severance. This determination is "committed to the sound discretion of the trial judge." *United States v. Spinelli*, 352 F.3d 48, 54 (2d Cir. 2003). Accordingly, this Court reviews the denial of a Rule 14 severance motion "only for abuse of

21

discretion" and will not reverse "unless the defendant demonstrates that the failure to sever caused him substantial prejudice in the form of a miscarriage of justice." *United States v. Blakney*, 941 F.2d 114, 116 (2d Cir. 1991). "It is not enough to demonstrate that separate trials would have increased the chances of the appellant's acquittal; rather, the appellant must show prejudice so severe as to amount to a denial of a constitutionally fair trial." *Spinelli*, 352 F.3d at 54-55.

## C. Discussion

### 1. Joinder Was Proper Under Rule 8

The District Court correctly concluded that Wynder's tax offenses were a natural and reasonably foreseeable continuation of Wynder and Brown's jointly undertaken fraud conspiracy. The two sets of offenses were part of the same "series of acts or transactions" under Rule 8.

This case involves a classic fact pattern in which revenue at issue in tax counts "arose directly" from a scheme charged in fraud counts. *Bonventre*, 646 F. App'x at 80 (quoting *United States v. Turoff*, 853 F.2d 1037, 1043-44 (2d Cir. 1988)); *see United States v. Little*, 828 F. App'x 34, 39-40 (2d Cir. 2020). As the Indictment alleged, without the fraudulent withdrawals at the core of the joint fraud conspiracy, LEEBA's operating account "would have been insolvent." (B-A. 41-42). From 2012 through 2019, that account was replenished with "more than $500,000" of fraud proceeds from the Annuity Fund scheme. (*Id.*). Some of those funds, in turn, were used "to enrich WYNDER at the expense of Annuity Fund participants, including

22

through unauthorized and excessive checks to WYNDER and cash withdrawals for WYNDER's benefit." (B-A. 40-41).

Those payments flowing directly from the fraud conduct form the core of the tax counts against Wynder. The tax conspiracy is almost entirely subsumed within the time period of the fraud conspiracy and is expressly charged as a scheme to fraudulently conceal payments "obtained from LEEBA, including money obtained in cash and checks." (B-A. 48-49). The listed overt acts in furtherance of the tax conspiracy and Wynder's failure to file returns all occurred during the joint Annuity Fund fraud scheme. (B-A. 50-52). The Indictment alleged that LEEBA's "legitimate operations did not generate sufficient revenue," and Wynder's use of its accounts to pay personal charges "resulted in [his] receipt of unreported income representing funds derived from non-tax violations." *Bonventre*, 646 F. App'x at 80; *Turoff*, 853 F.2d at 1043.

The two conspiracies plainly also have significant factual overlap. *See Bonventre*, 646 F. App'x at 80 (joinder is appropriate "when one scheme stemmed from the other, such that proof of one is indispensable for a full understanding of the other"); *Attanasio*, 870 F.2d at 815 (affirming joinder of defendants in separate conspiracies where they "shared a common purpose" and had "an overlap of participants and acts"). Here, both conspiracies occurred at the same time and involved the same organization. Wynder was the primary figure in both conspiracies, and enriching Wynder was an object of both conspiracies. *See id.* ("The transactions alleged in both conspiracy counts were part of a series of

23

acts that shared a common purpose: to conceal and launder Louis Attanasio's income . . . ."); *cf. Rittweger*, 524 F.3d at 176-77 (joinder appropriate where two of four individuals were "key participants in both schemes"). The two conspiracies tell different parts of a single story: the fraud conspiracy explains a source of funds for the tax conspiracy, and the tax conspiracy explains some of the dissipation of the fraud proceeds.

Brown attempts to distinguish these cases by arguing that the Indictment does not specifically allege that the "unspecified funds Wynder took in the Fraud Counts were the same funds Wynder failed to report in the Tax Counts." (B-Br. 48-49). Brown also suggests that, although the tax crimes occurred entirely during the period of the fraud conspiracy, "it is possible that the alleged fraud occurred either before or after Wynder's tax evasion counts." (*Id.*). But the Indictment alleges that "misappropriated" funds were used to "enrich Wynder" including through "unauthorized and excessive checks and cash withdrawals," and that he failed to report his income "from LEEBA, including money obtained in cash and checks." (B-A. 41, 48). The fraud offense spanned from 2012 to 2020, and the tax crimes occurred from 2015 to 2019. Brown's reading of the Indictment—that perhaps Wynder received all of his fraud proceeds between 2012 and 2015, notwithstanding the charged time period of the conspiracy, or that perhaps Wynder reported all of the fraud proceeds on his taxes and instead failed to report other income —is not a plausible reading of the Indictment. This Court's precedent does not impose that type of magic-words requirement, instead permitting a pragmatic

24

reading of the Indictment's allegations in a natural and logical manner.

Brown acknowledges that the Indictment charged that "one objective of the wire fraud scheme was to enrich Wynder" but argues that "nothing suggested that Mr. Brown was aware of or intended" that those funds would be used in a tax conspiracy. (B-Br. 47). But that is not the test for joinder. The Indictment alleged that Brown agreed to enrich Wynder with the proceeds of the fraud through cash and checks—*i.e.*, outside the LEEBA payroll system. (B-A. 40-41). As Judge Castel explained in denying Brown's severance motion, that Wynder would avoid paying taxes on his embezzled proceeds was "certainly a foreseeable consequence of the conspiratorial conduct." (B-A. 124). This is hardly a case in which one defendant has "at most . . . cursory knowledge" of the second conspiracy. (B-Br. 47 (*quoting United States v. Lech*, 161 F.R.D. 255, 257 (S.D.N.Y. 1995)).

Brown relies on *United States v. Shellef*, 507 F.3d 82, 99 (2d Cir. 2007), for the proposition that "the fact that funds alleged as part of one offense were used to perpetuate a subsequent offense was insufficient to link the offenses in a single indictment." (B-Br. 50). But as this Court has subsequently explained, in *Shellef* the tax conspiracy *predated* the wire fraud conspiracy. *See Bonventre*, 646 F. App'x at 80. The link in *Shellef* that this Court found insufficient was merely that the same businesses were used to commit tax violations and a later wire fraud. 507 F.3d at 99. That is not this case.

25

Finally, Brown argues that this Court's decision in *Rittweger*, 524 F.3d 171, "confirms that joinder was improper" here. (B-Br. 47-48). Not so. *Rittweger* involved two different schemes with overlapping participants to fraudulently induce customers to invest in a Ponzi scheme. This Court noted that both schemes had the same purpose, and two of the four defendants participated in both schemes. *Rittweger*, 524 F.3d at 177. *Rittweger* did not involve tax counts—and nothing in that decision disturbs this Court's holding in *Turoff* and its progeny that fraud and tax counts can be joined where untaxed revenue arose from fraud proceeds. In any event, *Rittweger* explains that joinder of two conspiracies can be proper even if they could not be charged as a single conspiracy, and that overlap in key participants is an important component of the case-by-case analysis. *Id.* at 177-78. So too here: the fraud and tax conspiracies have significant factual overlap, including the involvement of one of the two co-conspirators.

### 2. Any Misjoinder Was Harmless

In any event, any misjoinder did not have "substantial and injurious effect or influence in determining the jury's verdict." *Litwok*, 678 F.3d at 217. The evidence against Brown was overwhelming, and Brown has failed to identify any meaningful prejudice from the presence of the tax counts, let alone prejudice rising to the necessary severity.

First, as discussed above (*see supra* Point I), the evidence against Brown was particularly strong, such that there is no risk that the presence of the tax counts

26

against Wynder impacted the verdict against Brown. Two of Brown's assistants testified about Brown's role in sending withdrawal requests to the Annuity Fund with fake invoices he created. (Tr. 147-62, 171-78). Electronic messages reflected two instances in which Brown and Wynder expressly discussed fake reasons for the withdrawals. (GX 2209). In one instance, Brown repeatedly asked Wynder to make a withdrawal from the Annuity Fund so LEEBA could pay overdue bills to a life insurance company that was a significant client of Brown's, which would result in commission payments to Brown. (Tr. 296-311; GX 527, 2209, 1306-B-6). Brown proposed and ultimately used a fake reason for the withdrawal. (GX 432, 2209, 1306-B-6). In the face of this overwhelming evidence, there is no basis to conclude that any joinder error regarding Wynder's tax evasion charges had a substantial injurious effect on Brown. *United States v. Lane*, 474 U.S. 438, 449 (1986); *Litwok*, 678 F.3d at 217.

Second, contrary to Brown's assertion, there is no risk that Brown was improperly implicated in Wynder's "blatant failure to pay taxes." (B-Br. 53). The Government was clear in its arguments. For instance, in its summation, the Government addressed "the tax charges against Wynder only." (Tr. 706; *see also, e.g.*, Tr. 711 (arguing about proof of "Wynder's tax crimes")). The Government never argued that Brown was culpable for the tax conspiracy, and the District Court specifically instructed the jury to "consider each count of the indictment and each defendant's involvement in that count separately, and . . . return a separate verdict on each defendant for each count in which he is charged." (Tr. 791). There is "a strong

27

presumption that juries follow limiting instructions" absent an "overwhelming probability that the jury" was "unable" to do the "mental acrobatics" called for by a given instruction, which is not this case. *United States v. Snype*, 441 F.3d 119, 129-30 (2d Cir. 2006). The provision of such instructions is a strong indicator of harmlessness from misjoinder. *See Lane*, 474 U.S. at 442, 450-52.

It is true that, in the broader context of the trial, "the government linked Mr. Brown with Wynder," including by once referring to Brown as Wynder's "right-hand man" in opening statements when discussing the wire fraud conspiracy or by arguing that the proceeds of the joint fraud enriched Wynder. (B-Br. 53). But that is neither surprising nor indicative of substantial prejudice from misjoinder; Brown and Wynder were charged together in a fraud conspiracy, and it is perfectly reasonable for the Government to argue that alleged co-conspirators are linked to one another. That the defendants used fraud proceeds to enrich Wynder would be part of any fraud-only trial, but it was also a component of the tax counts. The Government would have made the same argument had the tax counts been severed. The two offenses involve the same money— the untaxed funds "arose directly" from the fraud scheme—so joinder was appropriate. *Bonventre*, 646 F. App'x at 80. It is entirely speculative to assert that, from this commonplace argument, the jury must have improperly assumed that Brown was implicated in the tax counts in contravention of the District Court's clear instructions, and therefore possibly convicted Brown of the wire fraud conspiracy based on improper considerations. (B-Br. 54-55). To the extent any

28

prejudice could arise in this ordinary manner, "some prejudice almost necessarily results" from joinder of multiple defendants, *Turoff*, 853 F.2d at 1043, but it is not the type of "actual prejudice" that had substantial and injurious effect or influence in determining the jury's verdict as required to vacate a conviction due to misjoinder, *Shellef*, 507 F.3d at 100.[2]

Nor is there force to Brown's argument that severance "would have prevented four significant government witnesses from testifying at Mr. Brown's trial." (B-Br. 52). At least some of those witnesses would likely have testified at a fraud-only trial to show how Wynder and Brown used the money withdrawn from the Annuity Fund, including to benefit Wynder. (*See, e.g.*, Tr. 515-23 (discussing Lexus lease for Wynder), 529-32 (discussing car payments made by LEEBA)). Other portions of the tax-related evidence would likely have been introduced to show Wynder's motive and intent under Fed. R. Evid. 404(b), again with an appropriate limiting instruction as to Brown. *Lane*, 474 U.S. at 450. And in any event, nothing about the mere fact

---

[2]  Brown's argument that he was prejudiced by Wynder's counsel's inaccurate statement in summations that Brown was a "tax advisor" (B-Br. 54), was not preserved, as Brown did not contemporaneously object to the statement. Accordingly, this Court's review is for plain error only, and Brown does not even attempt to demonstrate why this alleged error was plain or obvious or undermined the fundamental fairness, integrity, or public reputation of the proceedings. *See United States v. Marcus*, 560 U.S. 258, 262 (2010).

29

that four witnesses testified for less than one day of trial means that Brown was severely prejudiced by the joinder; indeed, joinder of additional counts almost always necessitates the presentation of additional evidence.

### 3. Judge Castel Did Not Abuse His Discretion in Denying Rule 14 Severance

Judge Castel acted well within his discretion in determining that the tax counts did not "introduce something inflammatory into this case" for purposes of Rule 14 spillover prejudice. (B-A. 124-124.1; *see* B-Br. 55).

For the same reasons discussed above, Brown's prejudice arguments do not come close to establishing "prejudice so severe as to amount to a denial of a constitutionally fair trial" as required by Rule 14. *Spinelli*, 352 F.3d at 54-55. Judge Castel's decision to try two co-defendants in a significant fraud case together, even with a small amount of additional evidence of one defendant's use of fraud proceeds to commit tax crimes, was an entirely permissible exercise of discretion that prioritized the efficiency of a joint trial with no meaningful prejudice to Brown. There is no basis to disturb Judge Castel's reasonable decision to try Wynder and Brown together.

30

## POINT III

### The District Court Did Not Abuse Its Discretion in Crafting a Remedy for the Government's Discovery Errors

Brown argues that Judge Castel abused his discretion in not imposing draconian sanctions for the Government's good-faith discovery errors. (B-Br. 56-58). The argument is baseless, as Judge Castel carefully fashioned a reasonable remedy that both cured any prejudice and preserved the jury's ability to engage in accurate factfinding.

### A. Relevant Facts

In June 2022, approximately one month before trial, the Government made three discovery productions resulting from inadvertent oversights. First, the Government learned that it had inadvertently never downloaded a batch of records from LEEBA's auditors that had been made available to the Government in November 2019 by temporary internet link. Upon noticing the error, the Government quickly obtained the records and produced them. (B-A. 137). Second, Brown's counsel notified the Government that a batch of records listed in the Government's July 2021 discovery cover letter were missing from the production. The Government determined that the records were likely overlooked because they had been stored separately and immediately produced them to Brown. (B-A. 144). Third, after conducting a careful re-examination of its discovery productions, the Government identified an additional batch of records that had similarly been

31

overlooked because they had been stored separately and immediately produced them to Brown. (B-A. 146).

In response, Judge Castel adjourned the trial by seven months and ordered briefing on whether sanctions should be imposed. (B-A. 216-18). Ultimately, Judge Castel strongly reprimanded the Government for its negligence but concluded that sanctions short of preclusion or an adverse inference instruction were sufficient because the Government had concededly not acted in bad faith. (B-A. 221-22, 229). Two of the possible sanctions listed in Fed. R. Crim. P. 16—ordering production and granting a continuance—had already occurred. (B-A. 228). Judge Castel concluded that, along with those steps, significantly early production of Jencks Act material, impeachment material, and draft exhibit and witness lists 90 days before trial was a reasonable additional remedy and sanction. (B-A. 229).

## B.  Applicable Law

Pursuant to Rule 16(d)(2), if a party fails to comply with its discovery obligations, the court may: "(A) order that party to permit the discovery or inspection . . .; (B) grant a continuance; (C) prohibit that party from introducing the undisclosed evidence; or (D) enter any other order that is just under the circumstances." Preclusion is "a severe sanction [that] would seldom be appropriate where . . . the government's violation did not result from its bad faith [and] a less drastic remedy (such as a continuance) will mitigate any unfair prejudice." *United States v. Marshall*, 132 F.3d 63, 70 (D.C. Cir. 1998). "When the government has failed to comply

32

with Rule 16, the district court has broad discretion to determine what remedial action, if any, is appropriate," and "the court's determination will not be set aside absent abuse of discretion." *United States v. Miller*, 116 F.3d 641, 681 (2d Cir. 1997). This Court will reverse only "if the nondisclosure results in substantial prejudice to the defendant." *United States v. Sanchez*, 912 F.2d 18, 21 (2d Cir. 1990).

## C. Discussion

Judge Castel did not abuse his discretion in crafting a remedy for the Government's inadvertent discovery errors. Rather, he reasonably concluded that a lengthy continuance that gave defense counsel more than sufficient time to review the belated discovery material would entirely cure any prejudice. Judge Castel also reasonably concluded that ordering early production of the Government's remaining pretrial disclosures—substantial windfalls for the defendants beyond what was strictly necessary to cure the belated disclosure—was sufficient to sanction the Government for its mistakes. Judge Castel reasonably determined that more draconian sanctions would be unwarranted because the resulting impairment of the trial's truth-seeking function was not justified given the lack of bad faith. This carefully crafted remedy was a reasonable response to the Government's good-faith but substantial oversights.

Brown's argument to the contrary, (B-Br. 56-58), is entirely meritless. Preclusion is a "severe sanction" that is "seldom" appropriate where the Government did not act in bad faith and "a less drastic remedy

33

(such as a continuance) will mitigate any unfair prejudice." *Marshall*, 132 F.3d at 70. And an adverse inference instruction typically makes sense only in spoliation cases, where the jury can be instructed to infer that missing evidence would have been harmful to the party responsible for its loss. *See, e.g., Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 161-62 (2d Cir. 2012). An adverse inference instruction about evidence that *is* presented to the jury makes little sense absent bad faith deliberate withholding of such evidence. Indeed, Brown has identified only one district court example in which an adverse inference instruction was given absent bad faith and spoliation, (B-Br. 57), but another judge's discretionary and fact-specific decision to impose such a sanction in another case does not mean that it was an abuse of discretion for the District Court not to do so here.

In any event, the chosen remedies ultimately fully cured the violations, leaving no prejudice to Brown at all—let alone the "substantial prejudice" required for reversal. *Sanchez*, 912 F.2d at 21. Brown asserts that the Government was free to further prepare for trial during the continuance, while his lawyers needed to review the new discovery productions. (B-Br. 56). A continuance is often the appropriate remedy for a good-faith but belated discovery production and does not inherently cause substantial prejudice. *See, e.g., United States v. Monsanto Lopez*, 798 F. App'x 688, 690-91 (2d Cir. 2020) ("Here, Appellant received the materials he argues were untimely produced over a month before trial . . . . Appellant also has not articulated on appeal a basis to find that he was prejudiced by the timing of this production and one is not easily

34

imagined."). Continuances rarely inure to the Government's benefit because witnesses may become unavailable and memories fade. In any event, any tactical advantage the Government gained from the continuance (and there was none) was more than canceled out by the District Court's sanctions order requiring the Government to provide remaining pretrial disclosures 90 days before trial (almost half the continuance period), providing Brown with a substantial trial-preparation windfall.

## POINT IV

### There Was No Plain Error in the Government's Summation

For the first time on appeal, Brown argues that the Government engaged in prosecutorial misconduct in summations by making three statements that Brown contends were factually inaccurate. (B-Br. 58-61). There was no error, plain or otherwise, in the challenged statements, which accurately described the evidence and urged reasonable conclusions.

### A. Applicable Law

In seeking a new trial based on allegations of prosecutorial misconduct, a defendant bears "a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of [his] right to a fair trial." *United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2011). "The government has broad latitude in the inferences it may reasonably suggest to the jury during summation." *United States v. Zackson*, 12 F.3d 1178, 1183 (2d Cir. 1993). As "summations—and

35

particularly rebuttal summations—are not detached expositions" and "frequently require improvisation, courts will not lightly infer that every remark is intended to carry its most dangerous meaning." *United States v. Farhane*, 634 F.3d 127, 167 (2d Cir. 2011).

A prosecutor's statements, even if improper, only result in denial of due process requiring a new trial when they caused "substantial prejudice to the defendant," a high bar that will "rarely" be met. *United States v. Mapp*, 170 F.3d 328, 337 (2d Cir. 1999); *see United States v. Young*, 470 U.S. 1, 11 (1985) ("[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone."). A reviewing court "must consider the objectionable remarks within the context of the entire trial," *United States v. Espinal*, 981 F.2d 664, 666 (2d Cir. 1992), granting relief only if the remarks, "viewed against the entire argument before the jury, deprived the defendant of a fair trial," *United States v. Pena*, 793 F.2d 486, 490 (2d Cir. 1986). The lack of a mistrial motion is a meaningful indicator that the trial was fair. *See United States v. Burns*, 104 F.3d 529, 537 (2d Cir. 1997).

Where a defendant failed to contemporaneously object to the challenged statements, this Court reviews only for plain error, *United States v. Perez*, 144 F.3d 204, 211 (2d Cir. 1998), which requires a showing of "flagrant abuse," *United States v. Zichettello*, 208 F.3d 72, 103 (2d Cir. 2000). To establish plain error, a defendant bears the burden of demonstrating that "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error

36

affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Marcus*, 560 U.S. at 262. "[R]eversal for plain error should be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Villa-fuerte*, 502 F.3d 204, 209 (2d Cir. 2007). "Meeting all four prongs [of the plain error standard] is difficult, as it should be." *Puckett v. United States*, 556 U.S. 129, 135 (2009).

## B.  Discussion

Brown challenges three statements in which the Government referred to Brown and Wynder collectively as "they" when, in Brown's view, the evidence only supported the challenged statement's applicability to Wynder. (B-Br. 58-59). Brown is wrong. The Government's summation statements neither deliberately misstated the evidence nor risked any material prejudice to Brown. Rather, the Government carefully walked through the evidence as to each defendant, distinguishing between Wynder and Brown's different roles and knowledge and urging reasonable inferences from the record. And any inadvertent imprecision caused no prejudice, let alone the substantial prejudice that seriously undermines the fairness, integrity, or public reputation of judicial proceedings required to establish plain error in the absence of objection. There

37

was no "flagrant abuse" here. *Zichettello*, 208 F.3d at 103.[3]

The challenged statements addressed knowledge that auditors had found improprieties with the annuity fund's books; obstruction of the audit; and lack of a formal time and expense sharing agreement for any purported joint Annuity Fund and union expenses. (B-Br. 59-60). While the evidence supporting those assertions may have been more direct as to Wynder, the record amply supported the reasonable inference that they applied to Brown as well. For example, while there was no direct evidence that Brown received the auditor's reports, he was aware of the audit (GX 220) and knew that the Annuity Fund was not in compliance with filing requirements (Tr. 390). Brown participated, by phone, in a meeting with the City's auditors in which the auditors explained how the union was out of compliance with City regulations and during which

---

[3] Contrary to Brown's assertion (B-Br. 59), *United States v. Grunberger*, 431 F.2d 1062, 1069 (2d Cir. 1970), does not support application of a more "flexible" standard of review than plain error. In *Grunberger*, decided more than 50 years ago, this Court merely concluded that a failure to object does not constitute a full *waiver* of appellate review. *Id.* In any event, any ambiguity in *Grunberger's* language has been superseded by the clear commands of Fed. R. Crim. P. 52(b) and the Supreme Court's more recent plain-error cases eliminating more relaxed standards for unpreserved objections. *See, e.g.*, *Marcus*, 560 U.S. at 262.

38

Wynder was particularly evasive in responding to the auditor's questions about how Wynder would keep the Annuity Fund's accounts segregated as required. (Tr. 228-29). While Brown may have acted as if he was intending to be helpful to the auditors (Tr. 348), the Annuity Fund's outside accountant had trouble getting documents from Brown (Tr. 341-42), Brown was slow in responding to those requests (*id.*), and that delay impacted the audit (Tr. 348). Moreover, Brown was aware that by 2019 the City was withholding contributions in escrow and that union was failing to pay its bills. (*See, e.g.*, GX 527).

Given Brown's awareness of these issues; his role as financial advisor to both the Annuity Fund and the union; his close relationship with Wynder; and his business sophistication and financial experience, it was entirely reasonable for the Government to urge inferences about Brown's knowledge. Brown was free to, and did, argue that the jury should draw different inferences, but the statements do not remotely approach prosecutorial misconduct. *See Farhane*, 634 F.3d at 167; *Zackson*, 12 F.3d at 1183.

The broader context of the Government's complete summation, *see Espinal*, 981 F.2d at 666; *Pena*, 793 F.2d at 490, further underscores that the challenged comments were not an improper attempt to argue guilt by association. The Government was consistently careful to distinguish between Wynder and Brown and to urge the jury to assess the evidence individually as to each. (*Compare* Tr. 676 ("LEEBA's auditors . . . told Wynder [the withdrawals] were improper," and "when the auditors kept pushing, Wynder shut down the

39

audit"), 690 ("Wynder got warnings from the audi-
tors"), *with* Tr. 676 ("[W]hile Brown didn't necessarily
directly receive the accountant reports, as Russel
Furey testified, he knew that the annuity fund was not
in compliance with city regulations"), 699 ("Brown was
slow to produce documents and produce[d] them incon-
sistently.")). On plain-error review, there is no basis to
conclude that the Government committed obvious im-
propriety by deliberately blurring the evidence be-
tween the two defendants.

In any event, Brown has failed to establish that the
isolated challenged remarks so severely prejudiced his
substantial rights as to have denied him a fair trial.
*Marcus*, 560 U.S. at 262; *Mapp*, 170 F.3d at 337. The
challenged remarks were only three short sentences of
an hour-long principal summation. The comments
were not inflammatory, and Brown's counsel neither
objected nor sought a mistrial. *See Burns*, 104 F.3d at
537. Indeed, Brown responded to the challenged points
in his own summation. (*See, e.g.*, Tr. 751-52). And the
District Court instructed the jury at least four times
that arguments of counsel are not evidence. (Tr. 7, 12,
668, 778). More broadly, given the strength of the Gov-
ernment's evidence against Brown as discussed above,
(*see supra* Point I), even if the challenged remarks
were improper—and they were not—there was no risk
that a few errant sentences in summation had any
meaningful impact on the jury's verdict.

40

## POINT V

### The District Court Did Not Plainly Err in Calculating Wynder's Restitution Obligation

For the first time on appeal, Wynder challenges the District Court's calculation of restitution, arguing that the $529,000 in total fraudulent withdrawals should have been offset by what Wynder alleges were "permissible expenses" under a City regulation. (W-Br. 59-71). There was no error, let alone plain error, in Judge Castel's order, without objection, that Wynder repay to the Annuity Fund the full amount he fraudulently withdrew from the fund.

### A.  Applicable Law

The Mandatory Victims Restitution Act ("MVRA") provides for mandatory restitution by a defendant convicted of a property offense under Title 18, "including any offense committed by fraud or deceit," where "an identifiable victim" has suffered a "pecuniary loss." 18 U.S.C. § 3663A(a)(1), (c)(1). "In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A); *see United States v. Qurashi*, 634 F.3d 699, 702 (2d Cir. 2011). The amount of restitution must be determined by a preponderance of the evidence. 18 U.S.C. § 3664(e).

"[T]he calculation of [a victim's] losses need not be mathematically precise," *United States v. Rivernider*, 828 F.3d 91, 115 (2d Cir. 2016). A district court must

41

make only "a reasonable estimate" of a victim's loss "based on the evidence before it." *United States v. Milstein*, 481 F.3d 132, 137 (2d Cir. 2007); *see also United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013) ("[A] reasonable approximation will suffice.").

This Court reviews restitution orders "deferentially" and will reverse only for abuse of discretion. *Gushlak*, 728 F.3d at 190; *see also United States v. Ismail*, 219 F.3d 76, 78 (2d Cir. 2000) ("Because a restitution order requires a delicate balancing of diverse, sometimes incomparable factors, . . . the sentencing court is in the best position to engage in such balancing."). To find such abuse, this Court must conclude that the restitution award rests "on an error of law, a clearly erroneous finding of fact, or otherwise cannot be located within the range of permissible decisions." *United States v. Pearson*, 570 F.3d 480, 486 (2d Cir. 2009).

Where a challenge to a restitution order was not raised below, this Court's review is for plain error only. *See* Fed. R. Crim. P. 52(b); *United States v. Zangari*, 677 F.3d 86, 91 (2d Cir. 2012).

## B. Discussion

Judge Castel did not err—let alone plainly err—by imposing restitution, without objection, in the full amount of Wynder's fraudulent withdrawals from the Annuity Fund.[4] The trial evidence overwhelmingly

---

[4] Brown raised a different objection to *his* loss amount, which the District Court rejected. (W-A. 1889-92).

42

demonstrated that Wynder defrauded the Annuity Fund and its members out of the full $529,000 that the defendants withdrew.

The Annuity Fund was an entirely separate entity from the union, and Wynder was fully aware that withdrawals from the Annuity Fund were permissible only to use that money on expenses pertaining to the administration of *the Annuity Fund*, not expenses of *the union*. (*See, e.g.*, GX 1401, 1903-B-T, 2003). A trustee of the Annuity Fund explained at trial that LEEBA paid other companies to administer the Annuity Fund and did not do that work itself. (*See, e.g.*, Tr. 428). Wynder identified no evidence at sentencing supporting the conclusion that any of the withdrawn funds had been properly used for *Annuity Fund*-related expenses, as opposed to improper *union*-related expenses. Given the highly fact-intensive nature of Wynder's arguments about restitution offsets and indirect benefits to fund participants, any error in not digging into the record to find and debate possible offsets was not so "clear or obvious," *Marcus*, 560 U.S. at 262, that the District Court should have been expected to raise the issue notwithstanding Wynder's express agreement with the loss calculation set forth in the Presentence Report. (*See* W-A. 1797, 1896).

Wynder asserts that Directive 12, a City regulation, permits certain types of administrative expenses, including for legal and auditor fees, to be withdrawn from the Annuity Fund, and that Wynder used some of the money he obtained from the fund to pay for such fees. (W-Br. 62-70). As an initial matter, Wynder is wrong about what is permitted under Directive 12.

43

(*See, e.g.*, Tr. 286-87). But even if that assertion is correct, the argument misses the point. Wynder was not convicted of violating Directive 12. He was convicted of fraud—inducing the Annuity Fund to transfer money to LEEBA by means of false or misleading misrepresentations. To induce the withdrawals, Wynder represented that the funds were being withdrawn to pay for administrative expenses of the *fund*, as required by the fund agreement and other sources. (*See* Tr. 286 (fund agreement limitation that "[u]nder no circumstances shall any part of the corpus or income of the Plan be used for, or diverted to, purposes other than for the exclusive benefit of the Participants . . . and to defray reasonable expenses of administration. Any funds contributed to the Plan and any assets of the Plan shall not . . . be used by or for the benefit of . . . the Union."); Tr. 336-38). Wynder's repeated false representations each time he directed a withdrawal that the withdrawal complied with this requirement suffices to establish that the Annuity Fund was wrongfully deprived of the full value of the withdrawals. Whether or not LEEBA then spent some of that money on union expenses that indirectly benefitted the union members within the meaning of Directive 12 is not relevant to determining how much money was withdrawn from the Annuity Fund under false pretenses. And Wynder has certainly failed to establish that any error in this regard was plain or obvious, or that an inaccuracy in the amount of restitution imposed without objection seriously undermines the fairness, integrity, or public reputation of judicial proceedings. *Marcus*, 560 U.S. at 262.

44

## POINT VI

## Wynder Did Not Receive Ineffective Assistance of Counsel

Wynder argues that he received ineffective assistance of counsel at trial because his lead attorney, George Goltzer, Esq., was suffering from a degenerative brain disease. (W-Br. 29-58). But Wynder has failed to establish that Goltzer's performance objectively fell below the constitutional minimum standard of competence guaranteed by the Sixth Amendment or that he suffered any prejudice as a result. In the alternative, if this Court has any concern that Wynder may not have received effective assistance, it should defer the matter to be considered on a motion pursuant to 28 U.S.C. § 2255, where the District Court will be better equipped to supplement the record as appropriate.

### A. Relevant Facts

Trial initially began on March 6, 2023. (W-A. 27-28). During jury selection, Goltzer suffered a medical incident and collapsed, and Judge Castel adjourned trial. (*Id.*).

At a status conference the following week, Goltzer explained that he was conferring with his doctor and asked for a further adjournment to determine how to proceed. (W-A. 331-32). Judge Castel granted the adjournment, explaining that the continuance permitted time "for an evaluation that is material to determining when this case can be tried and ensuring continuity of counsel if that is possible." (W-A. 334).

45

The next month, Goltzer explained that he had "met with a new team of doctors" and was prepared to set a new trial date. (W-A. 336). Judge Castel rescheduled trial for a month later. (W-A. 339).

Wynder was represented at trial by Goltzer and co-counsel Ying Stafford, Esq., (W-A. 29), who advanced a two-pronged trial defense. On the fraud scheme, Goltzer focused on the intent element, arguing that the Government could not prove beyond a reasonable doubt that Wynder had intent to defraud because Wynder acted at all times in the best interests of LEEBA union members. (*See, e.g.*, Tr. 22-27, 716-23). On the tax conspiracy, Goltzer argued that Wynder had acted in good faith and had filed his taxes for years, but he had encountered family problems that impeded his ability to pay his income taxes and ultimately fell behind on satisfying a payment plan that he had negotiated with the IRS. (*See, e.g.*, Tr. 25-26, 713-16). After the Government rested, Goltzer offered several defense exhibits on Wynder's behalf through a stipulation he had negotiated with the Government. (Tr. 631-32). Goltzer then used those exhibits during summation to argue that Wynder had carefully kept accurate records of the transactions, demonstrating his lack of criminal intent. (Tr. 719-20).

In early August 2023, two months after the conclusion of trial, Goltzer filed a sealed motion to withdraw as Wynder's counsel because he had experienced a "rapid deterioration" of his health that "render[ed] it impossible to represent [Wynder] adequately" for

46

sentencing and appeal.[5] He explained that his speech
had become slurred, and his "ability to concentrate and
write ha[d] been diminished." Goltzer stated that he
was being hospitalized for a week for further evalua-
tion, and he "simply cannot focus, research and write
or do the things that would enable me to properly rep-
resent [Wynder] *at this time.*" (Emphasis added).
Judge Castel granted Goltzer's motion to withdraw, di-
recting that Stafford continue to represent Wynder
and appointing Jeremy Schneider, Esq. as additional
counsel for sentencing. (W-A. 1785).

On January 17, 2024, at the conclusion of Wynder's
sentencing, Wynder sought bail pending appeal, argu-
ing that Goltzer was constitutionally ineffective be-
cause he was "ill during trial"—"not because trial
counsel was not a good lawyer, but because of his con-
dition at the time, his illness at the time [a]ffected his
ability to do the right thing on Mr. Wynder's behalf."
(W-A. 1942-43). Judge Castel denied the motion based
on his direct observations of Goltzer's performance at
trial, explaining:

> I was present for the trial. I was present
> for the pretrial proceedings. Mr. Goltzer
> was a vigorous and effective advocate in
> front of this jury, and this was not the
> first case he tried before me. He had tried
> one more than ten years before and I
> thought he was performing at a very high
> level in the trial before me and was very

---

[5] Wynder has submitted this filing to this Court
under seal.

47

> effective. And there's no—I'm not even
> sure that the ... ineffective assistance
> claim under *Strickland* is properly raised
> on a direct appeal.

(W-A. 1946). This Court later denied Wynder's similar application.

## B.  Applicable Law

### 1.  Ineffective Assistance of Counsel

To prevail on a claim of ineffective assistance of counsel, a defendant must: (1) demonstrate that counsel's performance fell below an "objective standard of reasonableness" under "prevailing professional norms"; and (2) "affirmatively prove prejudice" from the alleged dereliction. *Strickland v. Washington*, 466 U.S. 668, 687-88, 693-94 (1984); *accord Bennett v. United States*, 663 F.3d 71, 84 (2d Cir. 2011). Only if both elements are satisfied can the defendant demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. In raising such a claim, the defendant bears a "heavy burden." *United States v. Gaskin*, 364 F.3d 438, 468 (2d Cir. 2004).

A reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, bearing in mind that there are countless ways to provide effective assistance in any given case and that even the best criminal defense attorneys would not defend a particular client in the same way." *United States v. Aguirre*, 912

48

F.2d 555, 560 (2d Cir. 1990). Courts must presume that "the lawyer is competent to provide the guiding hand that the defendant needs." *United States v. Cronic*, 466 U.S. 648, 658 (1984). Thus, a reviewing court begins with a presumption that the attorney "was conscious of his duties to his clients and that he sought conscientiously to discharge those duties" unless and until the defendant proves otherwise. *Id.* at 658 n.23.

"[E]very effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. The emphasis should not be on grading counsel's performance but on "whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 696. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690. This Court has "declined to deem counsel ineffective notwithstanding a course of action (or inaction) that seems risky, unorthodox or downright ill-advised." *Tippins v. Walker*, 77 F.3d 682, 686 (2d Cir. 1996).

Prejudice under the second prong requires "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "An ineffectiveness claim . . . is an attack on the fundamental fairness of the proceeding whose result is challenged."

49

*Id.* at 697. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). "[N]ot every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Strickland*, 466 U.S. at 693.

## 2. Ineffective Assistance Claims on Direct Appeal

When a criminal defendant on direct appeal asserts that trial counsel provided ineffective assistance, this Court may: "(1) decline to hear the claim" and defer it to a subsequent motion pursuant to 28 U.S.C. § 2255; "(2) remand the claim to the district court for necessary factfinding; or (3) decide the claim on the [existing] record." *United States v. Morris*, 350 F.3d 32, 39 (2d Cir. 2003). Ordinarily, "a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance." *Massaro v. United States*, 538 U.S. 500, 504 (2003); *see also United States v. Khedr*, 343 F.3d 96, 99-100 (2d Cir. 2003). That is because "a trial record [is] not developed precisely for the object of litigating or preserving the [ineffective assistance] claim and [is] thus often incomplete or inadequate for this purpose." *Massaro*, 538 U.S. at 504-05. Indeed, there are numerous reasons why "few [ineffective assistance] claims will be capable of resolution on direct appeal":

> If the alleged error is one of commission, the record may reflect the action taken by counsel but not the reasons for it. The appellate court may have no way of knowing

50

> whether a seemingly unusual or mis-
> guided action by counsel had a sound
> strategic motive or was taken because the
> counsel's alternatives were even worse.
> The trial record may contain no evidence
> of alleged errors of omission, much less
> the reasons underlying them. . . . In addi-
> tion, the § 2255 motion often will be ruled
> upon by the same district judge who pre-
> sided at trial. The judge, having observed
> the earlier trial, should have an advanta-
> geous perspective for determining the ef-
> fectiveness of counsel's conduct and
> whether any deficiencies were prejudi-
> cial.

*Id.* at 505-07.

Where, however, the record is sufficiently devel-
oped on direct appeal, this Court can deny an ineffec-
tive assistance claim if its "resolution is beyond any
doubt or to do so would be in the interest of justice."
*Khedr*, 343 F.3d at 100; *accord Gaskin*, 364 F.3d at
467-68 (denying ineffective assistance claim on direct
appeal); *United States v. Fleurimont*, 401 F. App'x 580,
583 (2d Cir. 2010) (same); *United States v. De La Pava*,
268 F.3d 157, 163 (2d Cir. 2001) (same where claim
was "straightforward" and "susceptible to resolution
as a matter of law").

While an ineffectiveness claim can be denied on di-
rect appeal, it should not—absent "highly unusual cir-
cumstances"—be granted without affording prior
counsel an opportunity to explain his or her conduct.
*Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir. 1998)

("We believe that a district court facing the question of constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the assertedly ineffective attorney an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs."); *accord Cox v. Donnelly*, 387 F.3d 193, 201 (2d Cir. 2004); *Bloomer v. United States*, 162 F.3d 187, 194 (2d Cir. 1998).

## C. Discussion

### 1. This Court's Precedent Forecloses Finding *Per Se* Ineffective Assistance Here

Wynder first argues that Goltzer was categorically incompetent to render effective assistance because he was allegedly suffering from Creutzfeldt-Jakob Disease ("CJD") at the time of Wynder's trial. (W-Br. 32-45). The argument is foreclosed by this Court's en banc precedent.

This Court has recognized *per se* ineffective assistance of counsel in only two situations: (1) where counsel "not duly licensed at the time of trial," and (2) "where the lawyer is implicated in the crimes of his or her client." *Bellamy v. Cogdell*, 974 F.2d 302, 306 (2d Cir. 1992) (en banc); *see United States v. Kaid*, 502 F.3d 43, 46 (2d Cir. 2007). In all other circumstances, this Court insists on application of the traditional *Strickland* requirements of objectively unreasonable performance and prejudice. Even in cases where an attorney is asleep or out of the courtroom, for example, this Court has declined "to extend a rule of *per se* prejudice in any new direction." *Tippins*, 77 F.3d at 686-89 (finding prejudice where "counsel was repeatedly

52

unconscious at trial for periods of time in which defendant's interests were at stake"); *Kaid*, 502 F.3d at 47 (concluding that an attorney absence during trial was "likely objectively unreasonable" but that the defendant "must still demonstrate some prejudice").

In *Bellamy*, this Court—sitting en banc—squarely held that attorney illness is not a basis to apply a *per se* conclusion of ineffectiveness. 974 F.2d at 308. "[G]iven the varying effects health problems can have on an individual's ability to function, claims of ineffective assistance based on attorney illness are best suited to the fact-specific prejudice inquiry mandated by *Strickland*." *Id.* Accordingly, "[i]n order to assert a claim based on ineffective assistance due to illness, a defendant must point to specific errors or omissions in his courtroom behavior and conduct at trial that were a product of the attorney's illness. It is the magnitude of these errors that is determinative." *United States v. Eyman*, 313 F.3d 741, 743 (2d Cir. 2002); *accord Samet v. United States*, 559 F. App'x 47, 50-51 (2d Cir. 2014). This Court's holding in *Bellamy* precludes a panel of this Court from announcing a new category of *per se* ineffective assistance in circumstances involving attorney illness. *See Gilead Cmty. Servs. v. Town of Cromwell*, 112 F.4th 93, 100 (2d Cir. 2024) ("Our precedent is binding authority from which we cannot deviate, unless and until it is overruled either by an en banc panel of our Court or by the Supreme Court.").

Nor does Wynder identify any good reason to consider disease-specific *per se* rules of prejudice. CJD is far from the only disease that could cause potentially serious consequences for an attorney's mental

53

capacity. And even Wynder's description of this disease based on extra-record sources does not support the conclusion that the disease is an on-off switch for attorney competence. Even assuming Goltzer had early-stage CJD at trial—a fact not established on this record—Wynder's logic from that premise is faulty. Wynder relies on a description of CJD taken from a medical website stating that CJD usually "kills within a year," from which he jumps to the conclusion that Goltzer must have been suffering serious impairment from the disease as of December 2022, a year before his December 2023 death. (W-Br. 39-40). This type of speculation is plainly insufficient to warrant vacatur of a conviction, let alone adoption of a new *per se* rule that all such attorneys must be recognized as categorically incompetent. Indeed, Wynder concedes that approximately half of those with CJD pass away "within six months of the time their symptoms begin," (W-Br. 33), which is fully consistent with Goltzer not yet suffering from *any* meaningful symptoms during the May 2023 trial. This Court's holding in *Bellamy* that the normal *Strickland* standards apply to ineffective assistance claims based on attorney illness controls.

### 2.  Wynder Has Failed to Identify Objectively Deficient Performance by His Trial Counsel

Notwithstanding Wynder's vigorous criticisms of Goltzer's performance in hindsight, Wynder has not actually identified any instance in which Goltzer's performance fell below a minimum standard of competence such that it was akin to having no counsel at all. *See Strickland*, 466 U.S. at 687. Rather, all of Goltzer's choices, viewed objectively, *id.* at 687-88, were fully

54

consistent with reasonable strategic decision-making —even if current counsel would have defended the case differently.

In his brief, Wynder complains that Goltzer did not object enough times, litigate enough issues, or cross-examine enough witnesses. (W-Br. 46-59). But these generalized, post-hoc criticisms are not sufficient to establish deficient performance. *See Strickland*, 466 U.S. at 679. "Decisions about whether to engage in cross-examination, and if so to what extent and in what manner, are strategic in nature and generally will not support an ineffective assistance claim." *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002).

Indeed, all of the supposed inadequacies Wynder alleges are readily explainable as trial strategy, even if some of those strategic decisions failed to achieve their purpose. For example, given the defense's focus on *mens rea*, rather than challenging whether Wynder committed the *actus reus*, it was a reasonable strategic decision not to challenge two witnesses about whether Wynder in fact signed withdrawal forms. (W-Br. 47-48). Similarly, Goltzer's decision to cross-examine less than all of the Government's other witnesses is easily explained by the efficiencies and strategic choices in multi-defendant trials where counsel for the co-defendant has already engaged in vigorous cross-examination of a witness. And Goltzer's decision to say in summations that Wynder was probably not "somebody you'd want to be a business partner with" but was innocent of the charged crimes, (W-Br. 54-55), is a common defense tactic to labeling the Government's

55

evidence as indicative of, at most, personality flaws but not crimes.

Although Wynder claims, in hindsight, that Goltzer failed to substantively pursue *any* defense theory, he is wrong. Goltzer articulated a theory in his opening; offered multiple exhibits; and used those exhibits to argue lack of fraudulent intent in summation. Indeed, Judge Castel—who observed Goltzer's performance first-hand—swiftly rejected the suggestion that Goltzer's performance was constitutionally ineffective. In denying bail pending appeal, Judge Castel explained that Goltzer performed at a "very high level," was "very effective," and had been a "vigorous" advocate. (W-A. 1946). The kinds of choices of which Wynder now complains squarely fall within the usual presumption that counsel "was conscious of his duties to his clients and that he sought conscientiously to discharge those duties." *Cronic*, 466 U.S. at 658 n.23.

Goltzer's conduct while he was ill highlights his continued competence and professionalism through the conclusion of the trial. Goltzer was a longtime and well-respected criminal defense lawyer, who was a former President of the New York State Association of Criminal Defense Lawyers. (W-Br. 26 & n.7). After Goltzer collapsed on the first day of jury selection and Judge Castel adjourned trial, Goltzer consulted with a team of doctors who performed medical testing. Goltzer then informed the District Court that he was able to proceed with trial. It was only two months *after trial completed* when Goltzer suffered from neurological symptoms that, in his judgment, began impairing his abilities such that he needed to withdraw from his

56

representation of Wynder in advance of sentencing. At that time, Goltzer explained that his health had "rapid[ly] deteriorat[ed]"—not slowly over months—and Goltzer identified specific ways in which his advocacy for Wynder would no longer be adequate *going forward*.

Goltzer's handling of these difficult circumstances reflects his respect for his professional obligations and the care he took to ensure that he could live up to them. Goltzer delayed the trial until he confirmed with doctors that he was able to proceed. As soon as his condition adversely impacted his ability to perform effectively—months after trial was completed—Goltzer said so and withdrew. That series of decisions is consistent with a thoughtful and attentive legal professional. Wynder's theory, by contrast, requires concluding that his trial occurred in a Goldilocks-like period of incapacity in which Goltzer was sufficiently compromised to be unable to provide constitutionally effective representation, but not so compromised that he and his team of doctors were able to identify the issue. That theory is belied by Goltzer's own words and actions concerning his health, his history as an esteemed defense lawyer, and his objective performance at the trial. It is equally belied by the fact that neither Wynder nor Goltzer's co-counsel contemporaneously raised concerns about Goltzer's alleged incapacitation.[6]

---

[6] Wynder's sentencing counsel was not ineffective for failing to raise these claims at sentencing. (W-Br. 55-58). Sentencing counsel reasonably concluded

57

### 3. Wynder Does Not Even Attempt to Explain How the Alleged Ineffective Performance Caused Him Prejudice

Critically, nowhere in his brief on appeal does Wynder even *attempt* to establish a likelihood that the result of trial would have been different but for Goltzer's performance, instead choosing to hang his hat entirely on the legally foreclosed argument that prejudice should be presumed. (*But see supra* Point VI.C.1). That is not surprising; Wynder cannot come close to establishing prejudice because the evidence of his guilt was overwhelming. *See Harrington*, 562 U.S. at 112 (showing of prejudice must involve "substantial, not just conceivable," "likelihood of a different result"). There is no reasonable probability that the result of the trial would have been different but for Goltzer's allegedly inadequate performance. The evidence against Wynder included the testimony of his auditors, an audio recording in which he made false statements to union members about the purposes of his withdrawals from the Annuity Fund, financial records, his own electronic messages in which he expressly discussed with Brown what fraudulent misrepresentations to make, and other evidence. *See Garner v. Lee*, 908 F.3d 845, 862 (2d Cir. 2018) ("Even serious errors by counsel do not warrant granting *habeas* relief where the conviction is supported by overwhelming evidence of

––––––––––

that this was an issue for appeal and/or a collateral challenge, not sentencing, apart from bail pending appeal. (W-A. 1942-43).

58

guilt.").[7] Wynder has not established a substantial likelihood that the result of his trial would have been different absent the alleged inadequacy of counsel's performance.

### 4. Alternatively, Wynder's Ineffective Assistance Claim Should Be Deferred to a Section 2255 Motion

If this Court concludes that the record does not permit outright rejection of Wynder's ineffective assistance claim, it should defer the matter to a Section 2255 motion. Deferral will permit the District Court to supplement the record as appropriate and will allow Goltzer's co-counsel and Brown's counsel (to the extent a joint-defense arrangement existed regarding the division of cross-examination or other defense responsibilities) to explain the choices that were made at trial. *See Massaro*, 538 U.S. at 504 (expressing general preference for resolving ineffective assistance claims through Section 2255 motions); *Sparman*, 154 F.3d at 52 (trial counsel should be given opportunity to address allegations before finding of ineffective assistance is made). The record contains no non-speculative information about Goltzer's health *during* trial, as underscored by Wynder's attempts to supplement the record on appeal (W-A. 1786 (email)); (W-A. 1989-98 (declarations)); (W-Br. 33-34, 37, 39 (websites)). If this Court concludes there is some basis for concern—and

---

[7]    This Court should not permit Wynder to first identify prejudice in reply. *See McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009).

59

there is not—the record should be expanded in an orderly fashion through the Section 2255 process.

There is no reason for this Court to take the highly unusual step of remanding for fact-finding. (W-Br. 43); *see Khedr*, 343 F.3d at 100. Wynder argues that his claim is unusually simple (W-Br. 43)—but it is not, requiring at least the usual fact-intensive inquiry into attorney performance and, at most, a complicated foray into medical capabilities of individuals suffering from a degenerative brain disease. Wynder also argues that he should not be required to use his first *habeas* petition on such a claim (W-Br. 45). But that argument applies to every ineffectiveness claim on direct appeal and is inconsistent with the law's clear preference for collateral review. *See United States v. Doe*, 365 F.3d 150, 154 (2d Cir. 2004) (discussing benefits of considering all collateral attacks in one proceeding).

60

## CONCLUSION

**The judgments of conviction should be affirmed.**

Dated:     New York, New York
           October 25, 2024

                        Respectfully submitted,

                        DAMIAN WILLIAMS,
                        *United States Attorney for the*
                        *Southern District of New York,*
                        *Attorney for the United States*
                        *of America.*

ELI J. MARK,
ANDREW ROHRBACH,
JACOB R. FIDDELMAN,
   *Assistant United States Attorneys,*
              *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 13,997 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: JACOB R. FIDDELMAN,
*Assistant United States Attorney*